# THE DELAWARE.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

Nos. 555, 570. Argued January 10, 1896. — Decided March 2, 1896.

Gedney Channel, being the main entrance to the harbor of New York, is as much a part of the inland waters of the United States within the meaning of the act of March 3, 1885, c. 354, 23 Stat. 438, as the harbor within the entrance.

The real point aimed at by Congress in that act was to allow the original code (Rev. Stat. § 4233) to remain in force so far as it applies to pilotage waters, or waters within which it is necessary, for safe navigation, to have a local pilot.

The Delaware, returning to New York in ballast only, entered Gedney Channel upon a true course of W. by S. About the same time, the Talisman, a tug towing a pilot boat, entered it from the northwest, upon a course about S.SE., and not far from a right angle to the course of the Delaware. Under these circumstances, as they were approaching each other on crossing courses, the Delaware was bound to keep out of the way, and the Talisman to keep her course. The Delaware made no effort to avoid the Talisman, but kept on its course until about a minute before collision, when its engines were stopped too late. The Talisman was struck and sunk, and became a total loss. *Held,* that the Delaware was grossly in fault.

The Supervising Inspector's rules, so far as they require whistles to be used, ought to be construed in harmony with the International Code, and, as applied to vessels upon crossing courses, they mean that when a single blast is given by the preferred steamer she intends to comply with her legal obligation to keep her course, and throw upon the other steamer the duty of avoiding her.

It is the primary duty of a steamer, having the right of way when approaching another steamer, to keep her course; all authorities agree that this rule applies so long as there is nothing to indicate that the approaching steamer will not discharge her own obligation to keep out of the way; and it is settled law in the United States that the preferred steamer will not be held in fault for maintaining her course and speed, so long as it is possible for the other to avoid her by porting, at least in the absence of some distinct indication that she is about to fail in her duty.

The facts stated and referred to in the opinion leave too much doubt about the fault of the Talisman to justify the court in apportioning the damages.

The Delaware is not exempted from liability by the provisions of the act

of February 13, 1893, c. 105, 27 Stat. 445, entitled "An act relating to navigation of vessels, bills of lading, and to certain obligations, duties and rights in connection with the carriage of property."

This was a suit in admiralty instituted by Charles H. Winnett, the owner and master, and the crew of the tug Talisman against the steamship Delaware, to recover damages for a collision between these vessels, which occurred on September 16, 1893, about ten o'clock in the morning, in Gedney Channel, off Sandy Hook, at the outer entrance of New York harbor, and within three miles from land.

In the District Court the Delaware was held solely in fault, 61 Fed. Rep. 525, and a decree was entered against her for $21,318.70. Her owner thereupon appealed to the Circuit Court of Appeals, which affirmed the decree of the District Court as to the fault of the steamship, and certified to this court certain questions as to whether she was absolved from liability by the provisions of the act of February 13, 1893, c. 105, 27 Stat. 445, entitled "An act relating to navigation of vessels, bills of lading and to certain obligations, duties and rights in connection with the carriage of property." This certificate was docketed as a separate cause. The owner of the Delaware thereupon applied for and was granted a writ of certiorari to bring up the whole record, upon the ground that the Circuit Court of Appeals erred in failing to find contributory negligence on the part of the Talisman.

The first three sections, containing the material provisions of the act in question, commonly known as the Harter Act, are printed in the margin.[1]

---

[1] An act relating to navigation of vessels, bills of lading, and to certain obligations, duties, and rights in connection with the carriage of property. *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That it shall not be lawful for the manager, agent, master, or owner of any vessel transporting merchandise or property from or between ports of the United States and foreign ports to insert in any bill of lading or shipping document any clause, covenant, or agreement whereby it, he, or they shall be relieved from liability for loss or damage arising from negligence, fault, or failure in proper loading, stowage, custody, care, or proper delivery of any and all lawful merchandise or property committed to its or their charge. Any and all words or clauses of

Opinion of the Court.

*Mr. J. Parker Kirlin* for appellant.

*Mr. Harrington Putnam* for appellees.

MR. JUSTICE BROWN delivered the opinion of the court.

There are two questions involved in this case: *first*, whether the tug Talisman was guilty of a fault contributing to the collision; and, *second*, whether the Delaware is exonerated from liability under the act of February 13, 1893, known as the Harter Act, by the fact that her owners had used due diligence to make her seaworthy, and provide her with competent officers and crew.

1. Gedney Channel, in which the collision took place, is a dredged passage about 1100 feet in width, running from the open ocean in a direction about W. NW. ¼ W., and constituting the main entrance to New York harbor. It is defined by

such import inserted in bills of lading or shipping receipts shall be null and void and of no effect.

SEC. 2. That it shall not be lawful for any vessel transporting merchandise or property from or between ports of the United States of America and foreign ports, her owner, master, agent, or manager, to insert in any bill of lading or shipping document any covenant or agreement whereby the obligations of the owner or owners of said vessel to exercise due diligence, properly equip, man, provision, and outfit said vessel, and to make said vessel seaworthy and capable of performing her intended voyage, or whereby the obligations of the master, officers, agents, or servants to carefully handle and stow her cargo and to care for and properly deliver same, shall in any wise be lessened, weakened, or avoided.

SEC. 3. That if the owner of any vessel transporting merchandise or property to or from any port in the United States of America shall exercise due diligence to make the said vessel in all respects seaworthy and properly manned, equipped, and supplied, neither the vessel, her owner or owners, agent or charterers, shall become or be held responsible for damage or loss resulting from faults or errors in navigation or in the management of said vessel, nor shall the vessel, her owner or owners, charterers, agent or master, be held liable for losses arising from dangers of the sea or other navigable waters, acts of God, or public enemies, or the inherent defect, quality or vice of the thing carried, or from insufficiency of package, or seizure under legal process, or for loss resulting from any act or omission of the shipper or owner of the goods, his agent or representative, or from saving or attempting to save life or property at sea, or from any deviation in rendering such service.

red buoys, bearing even numbers, along its northerly side, at intervals of 2000 feet, and corresponding black buoys, bearing odd numbers, on the southerly side, at the same distance apart. Two iron can buoys, sometimes called fairway buoys, the northerly one red and the southerly one black, mark the outer entrance to the channel. About a mile out to sea beyond the channel entrance an automatic whistling buoy marks the prolongation of the central axis of the channel. Directly outside the entrance is located the station pilot boat, which anchors near black buoy No. 1, and sends out small boats to take off pilots who have been taking vessels to sea through the channel. Within the bar at the other end of the channel the water widens and the Swash Channel diverges from the main ship channel, as shown in the following diagram:

Counsel upon one, if not upon both, sides have assumed, upon the authority of *The Aurania* and *The Republic*, 29 Fed. Rep. 98, and *Singlehurst* v. *Compagnie Transatlantique*, 11 U. S. App. 693, that Gedney Channel is within the " coast waters of the United States," and therefore that the vessels involved were subject to the Revised International Regulations of March 3, 1885, c. 354, 23 Stat. 438. We think that they are mistaken in this assumption.

The International Code for preventing collisions was first adopted by act of April 29, 1864, now incorporated into the Revised Statutes as section 4233, and was made applicable generally to the " vessels of the Navy and of the mercantile marine of the United States." This code remained substantially unaffected by Congressional legislation until March 3, 1885, when the Revised International Regulations for preventing collisions at sea were adopted by act of Congress, and made applicable to " the navigation of all public and private vessels of the United States upon the high seas and in all coast waters of the United States." By section 2, all laws inconsistent with these rules were repealed, *except* as to the navigation of such vessels within the *harbors*, lakes, and *inland waters* of the United States. As to such waters, the original code of 1864 still remains in force, explained and supplemented by the rules of the Supervising Inspectors.

The act of 1885 did not attempt to draw the line between the high seas and the coast waters of the United States, on the one hand, and the harbors and inland waters, on the other. Nor was it possible by any general legislation to do so. We are of opinion, however, that the dredged entrance to a harbor is as much a part of the inland waters of the United States within the meaning of this act as the harbor within the entrance, and that the real point aimed at by Congress was to allow the original code to remain in force so far as it applied to pilotage waters, or waters within which it is necessary for safe navigation to have a local pilot. It is important that a pilot, while conducting a vessel in or out of a harbor, should not traverse waters governed by two inconsistent codes of signals, and if there are to be two codes, the

line should be drawn between the high seas, and the inland waters wherein the services of a local pilot are requisite for safe navigation. If, as has been suggested, ocean steamers were authorized or compelled to observe the new Revised Rules until their arrival at their docks, while vessels engaged in local traffic were observing the original rules, great confusion would result, and the probabilities of collision be materially increased. It is evident that all vessels running upon the same waters should be bound by the same rules and regulations in respect to their navigation.

Recent legislation has not only established the proper practice for the future, but has explained what must have been the intention of Congress in passing the original act. By act of February 19, 1895, c. 102, 28 Stat. 672, "to adopt special rules for the navigation of harbors, rivers and inland waters of the United States," these waters are declared to be still subject to the provisions of Rev. Stat. § 4233 (the original code) and to the regulations of the Supervising Inspectors, §§ 4412 and 4413. By section 2 the Secretary of the Treasury was authorized and directed from time to time "to designate and define by suitable bearings or ranges with light houses, light vessels, buoys or coast objects, the line dividing the high seas from rivers, harbors and inland waters." Pursuant to this authority the Secretary of the Treasury, on May 10, 1895, by Department Circular 95, designated and defined the dividing line between the high seas and the rivers, harbors and inland waters of New York as follows: "From Navesink (southerly) Light-House NE. ⅜ E., easterly, to Scotland Light Vessel, thence N. NE. ½ E. through Gedney Channel Whistling Buoy (proposed position) to Rockaway Point Life-Saving Station." The whole of Gedney Channel is within this line.

This of course must be accepted as the dividing line as to all future cases; but as the Secretary of the Treasury was merely directed to carry out the existing law upon the subject, we think it should be treated as cogent evidence of what the law had been before, and we are therefore of the opinion that Gedney Channel should be treated, for the purposes of this case, as belonging to the inland waters of the United

States. We are the less reluctant to take this course in view of the fact that the pilots of both steamers appear to have acted in contemplation of the Supervising Inspectors' Rules rather than the Revised International Rules and Regulations.

The Delaware was an English tank steamship of 2495 tons registered, 345 feet in length, and was engaged in the business of transferring petroleum in bulk from New York to London and Liverpool. She was returning to New York in ballast only, and had taken a duly licensed Sandy Hook pilot, who was in charge of her navigation at the time of the collision. The Talisman was an ocean tug, 100 feet in length, and at the time of the collision was engaged in towing the station pilot boat Edmund Driggs, with a hawser 15 fathoms in length, from a point some distance to the northward of the northerly line of Gedney Channel, diagonally across the channel towards the pilot station outside of the black fairway buoy, on the southerly side of the channel.

During the morning of the collision the weather was cloudy and overcast; until the Delaware got within three or four miles of the outer end of the channel, when a heavy rain squall came on, which lasted for about ten minutes, during which time the vessels were lost to view of each other. About four or five minutes before the collision, and when the vessels were probably a mile or more apart, the squall passed over, and each vessel sighted the other, and kept her in sight from that time until the collision. As the squall passed over, the pilot of the steamship made the outer red buoy about half a point on his port bow, and thereupon starboarded one point to bring the buoy upon his starboard bow, and was brought into the channel upon a true course of W. by S. At the same time the Talisman was entering the channel from the northwest, upon a course about S. SE., and not far from a right angle to the course of the Delaware.

Without inquiring minutely into the respective manœuvres and courses of the two steamers, it is sufficient to say that they were approaching each other upon crossing courses, and that under the 19th Rule, the steamship, having the Talisman on her starboard side, was bound to keep out of her way. By

Rule 23 there was a corresponding obligation on the part of the Talisman to keep her course. The Delaware made no effort to avoid the tug. Instead of porting as she entered the channel and passing up the starboard side, and astern of the Talisman, the pilot kept her on her course until about a minute before the collision, when the master, who had been below, ran hurriedly on the bridge, and seeing the Talisman about three points on his starboard bow, and close at hand, ordered the helm hard-a-starboard, and the engine stopped; though both orders were given too late to be of any service. The Delaware struck the Talisman upon the port quarter, about 15 feet from the stern, listing her heavily to starboard, and continued to push her sidewise through the water for about 300 feet, when she sank near the southerly side of the channel. A fireman who was trying to cast off the tow line was drowned; Captain Winnett's arm was severely fractured; and the tug became a total loss. It is evident from the bare statement that the Delaware was grossly at fault, and no claim is made to the contrary.

2. It is insisted, however, that the Talisman was also in fault in several particulars. It seems that, when the Delaware was about a mile off, the Talisman blew a single blast of her whistle, which does not appear to have been answered. When the Delaware was from a quarter to an eighth of a mile off, and the Talisman was a little above, or near the northerly edge of the channel, she sounded another single blast, which was not answered, although three of the libellant's witnesses from the Talisman seemed to have understood that it was answered. When the Delaware was about a length off, the Talisman sounded an alarm signal of three blasts, but did not change her helm or reduce her speed before the collision.

In this connection, the Talisman was charged with a violation of the Supervising Inspectors' rules, in not porting her helm and directing her course to starboard after sounding her first signal. These rules, however, so far as they require the whistle to be used, are applicable rather to vessels meeting end on or nearly end on, and the signals therein provided for are designed to apprise the approaching vessel of the inten-

tion of the steamer giving the signal, to port or starboard, as the case may be. As applied to vessels upon crossing courses, however, it means, when a single blast is given by the preferred steamer, nothing more than that she intends to comply with her legal obligation to keep her course, and throw upon the other steamer the duty of avoiding her. Such was evidently the view taken by both parties in this case, as there is not the slightest evidence that the pilot of the Delaware was misled by these signals, nor is a failure to port charged in the answer, or suggested in the testimony, as a fault on the part of the Talisman. These rules, so far as they require whistles to be used, ought to be construed in harmony with the International Code. If they were so construed as to require the preferred vessel to port, after having blown a blast of her whistle, it would involve a violation of article 23, which requires her to keep her course. On the other hand, if they be construed as applying chiefly to steamers meeting end on, or nearly end on, under Rule 18, they would frequently aid in solving any doubt with regard to the proposed course of the vessel giving the signal, and thus enable the meeting vessel to govern her own course accordingly. Certainly the rules should not be construed to require the steamer giving the signal to violate a plain statutory rule of navigation.

As bearing upon the proper interpretation of these rules, it is pertinent to observe that to Rule 23 of the act " to regulate navigation upon the Great Lakes and their connecting and contributory waters," approved February 8, 1895, c. 64, 28 Stat. 645, — a rule which corresponds in this particular feature with the Supervising Inspectors' Regulations, and with article 19 of the Revised International Regulations, — there is added the following qualification : " But the giving or answering a signal by a vessel required to keep her course shall not vary the duties or obligations of the respective vessels."

The main fault charged upon the Talisman, however, is that of not stopping and reversing, when the failure of the Delaware to take measures to avoid her became apparent. In *The Britannia*, 153 U. S. 130, which was also a case of a starboard hand collision, the preferred steamer, the Beaconsfield, was

held to have been in fault for stopping and reversing under similar circumstances — in other words, for doing what it is claimed the Talisman should have done in this case. Two members of the court dissented upon the ground that the Beaconsfield, having been brought into a position of peril by the negligence of the Britannia, was not in fault for stopping and reversing; the substance of their opinion being that, under such circumstances, the master might exercise his judgment as to the best method of avoiding a collision, and that an error in judgment should not be imputed to him as a fault. In neither opinion, however, was it intimated that, if the Beaconsfield had kept her speed, she would have been in fault for so doing.

The duty of a steamer having the right of way, when approaching another steamer charged with the obligation of avoiding her, has been the subject of much discussion both in the English and American courts. That her primary duty is to keep her course is beyond all controversy. It is expressly required by the 19th Rule of the original International Code, (Rev. Stat. § 4233,) and of the 16th Rule of the Revised Code of 1885, and doubtless applies so long as there is nothing to indicate that the approaching steamer will not discharge her own obligation to keep out of the way. The divergence between the authorities begins at the point where the master of the preferred steamer suspects that the obligated steamer is about to fail in her duty to avoid her. The weight of English, and, perhaps, of American authorities, is to the effect that, if the master of the preferred steamer has any reason to believe that the other will not take measures to keep out of her way, he may treat this as a " special circumstance," under Rule 24, " rendering a departure " from the rules " necessary to avoid immediate danger." Some even go so far as to hold it the duty of the preferred vessel to stop and reverse, when a continuance upon her course involves an apparent danger of collision. Upon the other hand, other authorities hold that the master of the preferred steamer ought not to be embarrassed by doubts as to his duty, and, unless the two vessels be *in extremis*, he is bound to hold to his course and speed.

The cases of *The Britannia*, 153 U. S. 130, and *The North-field*, 154 U. S. 629, must be regarded, however, as settling the law that the preferred steamer will not be held in fault for maintaining her course and speed, so long as it is possible for the other to avoid her by porting, at least in the absence of some distinct indication that she is about to fail in her duty. If the master of the preferred steamer were at liberty to speculate upon the possibility, or even of the probability, of the approaching steamer failing to do her duty and keep out of his way, the certainty that the former will hold his course, upon which the latter has a right to rely, and which it is the very object of the rule to insure, would give place to doubts on the part of the master of the obligated steamer as to whether he would do so or not, and produce a timidity and feebleness of action on the part of both, which would bring about more collisions than it would prevent. *Belden* v. *Chase*, 150 U. S. 674; *The Highgate*, 62 L. T. R. 841 ; *S. C.* 6 Asp. Mar. Law Cases, 512.

In the case under consideration there was really nothing to apprise the tug that the Delaware would not port and go under her stern, until the collision became inevitable. The vessels were in plain sight of each other. The Delaware was entering a channel, whose course was marked by buoys, and she could not possibly have continued her then course without soon crossing the line of black buoys, which marked the southerly edge of the channel. There was every reason to suppose that, as soon as she passed the line of red buoys at the northerly edge, she would port and take her proper course up the channel, and if for any reason she was unable to do this, it was her plain duty to apprise the tug of the fact either by blowing the starboard signal of two whistles, or an alarm whistle, to indicate that the circumstances were such as to render it impossible for her to fulfil her obligation to keep out of the way of the tug. If she had done so a different question would have been presented. Until the last moment the tug had a right to assume that she would comply with the rule. Had the tug stopped and reversed, she might not only have brought about a collision with the Delaware, but would

have incurred the danger of a collision with her own tow. It is true the Delaware did not answer the signals of the Talisman as she should have done, but Captain Winnett, who was in charge, testifies that he was under the impression that she answered the first whistle, and made an allegation to that effect in his libel. He appears to have been mistaken in this, but as the morning was somewhat thick he might have thought so, and was not in fault for acting upon that hypothesis. The second whistle was given so late that the vessels were evidently *in extremis* before a reasonable time had elapsed in which to answer it. In any event there is too much doubt about the fault of the Talisman to justify us in apportioning the damages.

3. Is the Delaware exempted from liability by the act of February 13, 1893, entitled "An act relating to navigation of vessels, bills of lading and to certain obligations, duties and rights in connection with the carriage of property"? This is the first case in which this act, which has an important bearing upon the rights of shippers, has been called to our attention.

The *first* section declares it to be unlawful for the manager, etc., of any vessel engaged in foreign trade, to insert in any bill of lading any covenant or agreement whereby the vessel or her owner "shall be relieved from liability for loss or damage arising from negligence, fault or failure in proper loading, stowage, custody, care or proper delivery of any and all lawful merchandise or property committed to its or their charge," and that any such clause shall be null and void. The *second* section declares it to be unlawful for any such vessel to insert in any bill of lading any covenant whereby the obligation of the owner to exercise due diligence to properly equip, man, provision, and outfit said vessel, and to make her seaworthy, and to carefully handle and stow her cargo, and to care for and properly deliver the same, shall in anywise be lessened, weakened, or avoided. The *third* section provides that, if the owner shall exercise due diligence to make her seaworthy, "neither the vessel, her owner or owners, agent, or charterers shall become or be held responsi-

ble for damage or loss resulting from faults or errors in navigation or in the management of said vessel," nor shall they be "liable for losses arising from dangers of the sea, or other navigable waters, acts of God or public enemies, or the inherent defect, quality or vice of the thing carried, or from insufficiency of package, or seizure under legal process, or for loss resulting from any act or omission of the shipper or owner of the goods, his agent or representative, or from saving or attempting to save life or property at sea, or from any deviation in rendering such service." The *fourth* section makes it obligatory to issue to shippers a bill of lading, stating certain particulars, which document shall be *prima facie* evidence of the receipt of the merchandise therein described. The *fifth* section is penal in its character. The *sixth* reserves the application of the limited liability act; and the *seventh* excepts vessels engaged in the transportation of live animals.

Respondent relies, in this connection, upon the first clause of section 3: "That if the owner of any vessel, transporting merchandise or property to or from any port in the United States of America, shall exercise due diligence to make the said vessel, in all respects, seaworthy and properly manned, equipped and supplied, neither the vessel, her owner or owners, agent or charterers, shall become or be held responsible for damage or loss resulting from faults or errors in navigation or in the management of said vessel."

It is entirely clear, however, that the whole object of the act is to modify the relations previously existing between the vessel and her cargo. This is apparent not only from the title of the act, but from its general tenor and provisions, which are evidently designed to fix the relations between the cargo and the vessel, and to prohibit contracts restricting the liability of the vessel and owners in certain particulars connected with the construction, repair and outfit of the vessel, and the care and delivery of the cargo. The act was an outgrowth of attempts, made in recent years, to limit, as far as possible, the liability of the vessel and her owners, by inserting in bills of lading stipulations against losses arising from unseaworthiness,

bad stowage and negligence in navigation, and other forms of liability which had been held by the courts of England, if not of this country, to be valid as contracts and to be respected even when they exempted the ship from the consequences of her own negligence. As decisions were made by the courts from time to time, holding the vessel for non-excepted liabilities, new clauses were inserted in the bills of lading to meet these decisions until the common law responsibility of carriers by sea had been frittered away to such an extent that several of the leading commercial associations, both in this country and in England, had taken the subject in hand and suggested amendments to the maritime law in line with those embodied in the Harter Act. The exigencies which led to the passage of the act are graphically set forth in a petition addressed by the Glasgow Corn Trade Association to the Marquis of Salisbury and embodied in a report of the Committee on Interstate and Foreign Commerce of the House of Representatives. As a part of the history of the times, this is a proper subject of consideration. *American Net & Twine Co.* v. *Worthington,* 141 U. S. 468, 474.

" That, taking advantage of this practical monopoly, the owners of the steamship lines combined to adopt clauses in their bills of lading, very seriously and unduly limiting their obligations as carriers of the goods, and refuse to accept consignments for carriage on any other terms than those dictated by themselves.

" That this policy has been gradually extended by the steamship owners until at the present time their bills of lading are so unreasonable and unjust in their terms as to exempt them from almost every conceivable risk and responsibility as carriers of goods.

" For example, many of these bills of lading provide, in addition to the usual and reasonable exceptions, that the carriers shall not be liable for loss or damage occasioned by negligence of the master, pilot, stevedores, crew or others in their employment; nor for bad stowage; nor for defect or insufficiency of the hull, machinery or fittings of a vessel, whether occurring before or after receiving the goods on board; nor

for the admission of water into the vessel by any cause, and whether for the purpose of extinguishing fire or for any other purpose, and whether occurring previously or subsequently to the vessel's sailing; nor for the differences between the quality, marks or brands of flour or other goods shipped and those of the goods actually found to be on board of the steamer (the marks, numbers or description in the bill of lading notwithstanding); nor for loss of weight ; nor for detention, delay or deviation.

"Such bills of lading also frequently exempt the carrier from any claim not intimated before delivery of the goods, and at the same time provide that the master porterage of the goods on arrival of the steamer shall be done by the steamship owners or their agents at the expense and risk of the receivers, so that the receivers have no opportunity before the delivery of their goods of ascertaining whether they are damaged or not, or how or in what part of the hold they may have been stowed.

"That bills of lading have thus become so lengthened, complex and involved, that in the ordinary course of business it is almost impossible for shippers of goods to read or check their various conditions, even if objections would be listened to, and the hardship is aggravated by the fact that new and more stringent conditions are constantly being added by the shipowners to provide for new questions or claims that have arisen.

"That a striking illustration of this is the fact that recently a clause has been added to certain steamship forms of bill of lading actually giving the shipowners a right of lien over, and the right to sell the goods entrusted to them for carriage, not only for the freight upon the goods themselves, but for all debts due, either by the shippers, or the consignees of such goods, to the carriers or their agents, though these debts may have arisen on contracts unconnected with the carriage of such goods. The effect of this clause is to render the bill of lading, which has been of such essential service on account of its negotiable character in promoting the commercial prosperity of Great Britain, a document unfit for negotiation."

No complaint was made in this connection of the liability of vessels under the ordinary forms of bills of lading, or their liability to other vessels for the consequences of their negligence, the evil to be remedied being one produced by the oppressive clauses forced upon the shippers of goods by the vessel owners. It is true that the general words of the third section, above quoted, if detached from the context and broadly construed as a separate provision, would be susceptible of the meaning claimed, but when read in connection with the other sections, and with the remainder of section 3, they show conclusively that the liability of a vessel to other vessels with which it may come in contact was not intended to be affected.

The first, second, fourth, and seventh sections deal exclusively with bills of lading and their covenants, and the third section, after using the general language relied upon by the respondent here, with regard to non-liability for faults or errors in navigation or in the management of the vessel, contains a further exemption of "loss arising from dangers of the sea, or other navigable waters, acts of God or public enemies, or the inherent defect, quality or vice of the thing carried, or from insufficiency of package, or seizure under legal process, or for loss resulting from any act or omission of the shipper or owner of the goods, his agent or representative, or from saving or attempting to save life or property at sea, or from any deviation in rendering such service." These provisions have no possible application to the relations of one vessel to another, and are mainly a reënactment of certain well-known provisions of the common law applicable to the duties and liabilities of vessels to their cargoes. The fact, too, that by section 6 the various sections of the Revised Statutes, which embody the limited liability act, are preserved unimpaired, would seem to indicate that the later act was not intended to receive the broad construction claimed.

The decree of the court below is, therefore,

*Affirmed.*