THE FRIESLAND.

THE BELLARDEN.

BELL v. THE FRIESLAND.

THAMES & M. MARINE INS. CO. v. THE FRIESLAND and THE BELLARDEN.

(District Court, N. D. New York. November 7, 1896.)

COLLISION — CROSSING COURSES — CONTRARY SIGNALS — PRIVILEGED VESSEL RIGHTLY STOPS—RULE 21.

The steamship Friesland, inward bound, soon after leaving Quarantine, saw the steamer Bellarden coming down the Bay at least a half mile distant, a little on the starboard bow. The B. gave 3 signals of one blast each, being bound for anchorage ground on her right, and having the F. 2 or 3 points on her port hand. The F., not hearing the first two signals of the B., gave two successive blasts of two whistles each, and starboarded. These whistles being heard by the B. and understood as a dissenting reply to her own signal of one whistle, she first slowed, then stopped. To her third signal of one whistle the F. replied with one and the B. then started ahead. Had she not slowed and stopped previously, the collision would have been avoided. *Held,* that stopping by the B., the privileged vessel, was in conformity with the requirements of Rule 21, in the presence of immediate danger of collision; and that the F. was wholly in fault for going to the left instead of the right, and for undertaking to cross the bow of the B. and starboarding without the B.'s assent.

Cowen, Wing, Putnam & Burlingham, for the Bellarden.

Robinson, Biddle & Ward, for the Friesland.

Butler, Notman, Joline & Mynderse, for the Thames & M. Marine Ins. Co.

BROWN, District Judge. The above libels were filed to recover damages sustained by the steamship Bellarden and her cargo, through a collision with the steamship Friesland, which occurred at about 6:25 p. m. of April 7, 1896, within the limits of the anchorage ground off Stapleton, Staten Island, while the Friesland was coming up the Bay after leaving Quarantine.

The weather during the day had been snowy, but was at this time clearing; and the evidence leaves no doubt that vessels could be seen at least half a mile distant, and as it would seem from the testimony ¾ of a mile to a mile. The Bellarden had previously been at anchor off Liberty Island, but left there for the purpose of anchoring off Stapleton. She had started from Liberty Island on the last of the flood, and the current at the place of collision had begun to run ebb about fifteen minutes before this accident, and was consequently weak. The Friesland, after stopping at Quarantine, had but a few minutes before resumed her course up the Bay, keeping, however, to the left of the usual course, and within the anchorage limits prescribed by the Secretary of the Treasury.

When the Friesland started from Quarantine, the tug Ocean King was a little way ahead of her, and to the eastward, not far from mid-channel, with two large barges in tow, one behind the other, the Corsica and the Kingston, each on hawsers about 300 feet long, and going up at the rate of about 5 or 6 knots an hour. About the same time also the steamship El Norte passed the Friesland, going up the Bay between the line of the course of the Friesland and the tug's course, and going at the rate of about 12 knots.

Before the Bellarden was seen by the officers of the Friesland, the latter heard a signal of two whistles given both by the tug and by the El Norte; and though they heard no answer, they understood those signals to be given to some vessel coming down the Bay. Soon afterwards the Bellarden was seen heading towards the Staten Island shore, showing her port side, and from one to two points on the starboard bow of the Friesland. She was estimated to be from half a mile to three-quarters of a mile distant, and the Friesland at that time was heading about north. When the Bellarden was seen, the El Norte had passed to the northward out of sight, and the Friesland had overtaken and lapped the Kingston,—the hindermost barge of the tow. The Friesland was probably going at the rate of about 6 or 7 knots, and the Bellarden at about the same rate.

The Bellarden had come down but a little to the eastward of the anchorage limits, passing within a hundred feet of the end of the line of the shad poles off St. George. This would make her distance from the anchorage line at that point only about 400 feet. About one-third of a mile below this point the El Norte, going up, passed to the westward of the Bellarden. After passing the El Norte, and before the Friesland was seen, the Bellarden turned to starboard about two points to go to an anchorage, and headed about S. S. W., so that when the two vessels became visible to each other, the Bellarden had the Friesland some two or three points on her port bow, and the Bellarden kept substantially that course until collision.

As soon as the Friesland was seen, a signal of one whistle was given to her by the Bellarden, and a signal of two blasts came from the Friesland, seemingly in reply. The Bellarden thereupon slowed and gave another signal of one whistle, to which she again received a signal of two blasts from the Friesland; whereupon the Bellarden gave a signal of one blast for the third time, and stopped her engine. To the last signal a reply of one whistle was heard from the Friesland; whereupon the Bellarden started her engines full speed ahead and ported her wheel. Soon afterwards, seeing that the Friesland was likely to strike her stern, and when her bow had already passed the bow of the Friesland, the Bellarden starboarded her wheel for the sake of throwing her stern to starboard; but the bowsprit of the Friesland caught the aft rigging on the port quarter of the Bellarden, which drew the vessels together, so that the stem of the Friesland struck the Bellarden on her port quarter about 25 feet from her stern, and caused damages which required her to be beached immediately.

There is some contradiction in the answer and evidence on the part of the Friesland as to whether her first signal of two whistles was given before the Bellarden was seen or after. Some witnesses say that the first signal of two blasts was given in consequence of hearing similar signals given by the tug, and the El Norte, before the Bellarden was visible. All agree that when the Bellarden was first seen she showed her port side, and that she was one or two points on the starboard bow of the Friesland, and at least a half mile distant. Her officers claim that only one whistle was heard from the Bellarden; and that as soon as that was heard they replied with one whistle and reversed, having previously slowed and stopped after their signals of two whistles. It is further claimed on the part of the Friesland that the tug and tow on her starboard side were an embarrassment to her movements so as to prevent her porting and undertaking to keep to the right. The weight of evidence, however, shows that at the time of collision the tug and tow were from 600 to 900 feet to the eastward of the Friesland, if not more; that the tug and tow had not starboarded or turned their heading to port at all, as contended on the part of the Friesland. I must find, therefore, that there was nothing in the situation of the tug and tow to prevent the Friesland from observing the ordinary rule of the road, in performing her duty to keep out of the way of the Bellarden, either by going somewhat to the right under a port wheel, or by checking her speed until the Bellarden had passed.

Even if the first two signals of the Bellarden were not heard, and no signal seemed to come from the Bellarden, the duty of the Friesland to keep out of her way remained unaffected; and the Friesland's proposal to depart from the rule of the road by going to the left under a signal of two whistles, was at her own risk. The Transfer No. 5, 49 Fed. 398; The Rockaway, 38 Fed. 856, affirmed 43 Fed. 544; The Baltimore, 56 Fed. 127.

The position and course of the Bellarden were manifest at least half a mile off, which afforded sufficient space and opportunity for

the Friesland to keep out of the way of the Bellarden, either by porting, or by checking her speed, or by backing sooner. The duty of keeping out of the way was cast by law upon her, and it necessarily follows that she must be held responsible for the collision, unless she shows clearly that proper efforts were made by her which were thwarted by some misconduct of the Bellarden.

In behalf of the Friesland, it is alleged that it never occurred to her officers that the Bellarden was intending to come to anchor within anchorage ground, but that they supposed she was going out to sea, and would, therefore, turn to the eastward of the Ocean King, although that would have required a change of course by the Bellarden of several points. The officers of the Friesland, however, were not justified in acting on any such supposition, contrary to the manifest course which the Bellarden was pursuing. The Bellarden steadily kept her course. All that was requisite for the Friesland to do was to check her speed sufficiently to avoid collision. The evidence of her log shows that she did not reverse until less than a minute before collision. Only a half minute before reversing, she stopped her engines, and a minute and a half before stopping, she slowed. In the meantime she had put her helm to starboard and turned her head somewhat to port, without any assenting whistle from the Bellarden. This was an independent fault in her manoeuvres, for which there was no justification in any change by the tug, as alleged. There can be no doubt that the Bellarden gave her three signals of one blast. Numerous witnesses testify to that fact. In this regard there was no fault in the Bellarden. The Friesland appears to me, therefore, very clearly to blame.

The distance of the vessels apart when the one admitted signal of the Bellarden was heard on the Friesland, or seen by the escaping steam, is variously stated. The pilot of the Friesland first said the vessels were at that time half a mile apart, later, ⅔ of a mile; most of the other witnesses place the vessels very much nearer. It is not certain that it was not the first or second blast of the Bellarden that the pilot of the Friesland observed by the escaping steam. If the Friesland did not reverse until the Bellarden was within a couple of lengths of her, as most of the evidence indicates, her fault was only the more gross and clear.

Under the circumstances of the present case, it cannot be held a fault in the Bellarden that she slowed her engine and stopped, as she did. Had she heard no signals from the Friesland, she might have assumed that the Friesland was intending to perform her duty of keeping out of the way by following the usual rule of the road in keeping to the right. But plainly the Bellarden could not rely on any such inference when she got a signal of two whistles signifying directly the contrary, viz., that the Friesland intended to cross her bow. From the courses of the two vessels this was manifestly a dangerous manoeuvre, and from the moment that that signal was heard in reply to the Bellarden's previous signal of one whistle, risk of collision was evident; and from that moment Rule 21 of the Revised Statutes (which applies in this case) came into

operation, and required the Bellarden "to slacken her speed, or, if necessary, to stop and reverse." When in answer to the Bellarden's second signal of one whistle the contrary signal was repeated by the Friesland, the situation became more critical, and it was heightened by the apparent starboarding of the Friesland, indicating a positive determination wrongfully to cross the Bellarden's bows, in spite of the latter's signals. To stop, under Rule 21, became, therefore, apparently necessary. The Bellarden cannot be held in fault for observing this rule. Under these contrary signals, moreover, it was the duty of the Bellarden, under Rule 3 of the Supervising Inspectors, to reduce her speed to bare steerageway. The general provision that the vessel shall keep her speed, as well as her course, does not apply when the privileged vessel has distinct notice that the other vessel is not taking, and does not intend to take, the necessary measures to avoid collision. The Columbia, 23 Blatchf. 268, 25 Fed. 844; The Grand Republic, 16 Fed. 424; The Delaware, 161 U. S. 459, 469, 16 Sup. Ct. 521. In the latter case it is said:

"The preferred steamer could not be held in fault for maintaining her course and speed so long as it is possible for the other to avoid her by porting, at least in the absence of some distinct indication that she is about to fail in her duty."

Here the indication that the Friesland was disregarding her duty was distinct, by the giving of contrary signals, and Rule 21 became imperative.

I am of the opinion that there was no fault on the part of the Bellarden, and that the Friesland alone must be held to blame for the collision.

Decrees accordingly.