---

### THE C. R. HOYT.

(District Court, D. New Jersey. March 31, 1905.)

1. COLLISION—STEAM VESSELS MEETING—VIOLATION OF RULES.

The tug Hoyt, passing up East river on the Brooklyn side in the daytime, exchanged crossing signals with the ferryboat Fulton, crossing from New York; the Hoyt, as the privileged vessel, being required to keep her course and speed, and the Fulton to cross under her stern. The Fulton, however, held her course, and came so close to the Hoyt that the latter, to avoid collision, when under the Fulton's bows starboarded her helm, throwing her head nearly across the river. During such time the tug No. 9 was coming down the river, and had given three signals to the Hoyt for passing port and port, none of which were answered. After the Hoyt had passed the Fulton, both she and the No. 9 gave alarm signals, ported, and reversed, but were then so near together that a collision occurred. *Held*, that the danger of the Hoyt from the Fulton, which was within full view of the pilot of the No. 9, was a "special circumstance" within the meaning of the rules (23 Stat. 438 et seq., rule 23) which required the latter to slacken speed or to stop and reverse, and that she was in fault for keeping her course and speed; that the Hoyt was also in fault for failing to answer the signals of the No. 9, although not for her maneuver in passing the Fulton.

[Ed. Note.—Collision. Signals of meeting vessels, see note to The New York, 30 C. C. A. 630.]

2. SAME—DIVISION OF DAMAGES.

Under the American, and also the English, rule in admiralty, where each of two vessels contributes by her fault to a collision, the damages will be equally divided.

[Ed. Note.—For cases in point, see vol. 10, Cent. Dig. Collision, § 296.]

In Admiralty. Libel and cross-libel for collision.

James J. Macklin, for libelant.
Carpenter & Park, for cross-libelant.

LANNING, District Judge. On August 17, 1895, a collision occurred in the East river, New York, just below the Brooklyn Bridge, and just east of the middle of the river, between steam tug No. 9 and the steam tug C. R. Hoyt. Each of the vessels claims damages against the other. The libelant is the owner of No. 9.

The Derby Transportation Company is the owner of the Hoyt. The libel was filed September 23, 1895, and the answer thereto on June 10, 1896. The first witness for the libelant, John B. Baulsir, the pilot of the ferryboat Fulton, was examined December 2, 1896. On April 9, 1898, George Ward Smith, engineer, John Rennerts, fireman, and Alec Brant, oiler, of steam tug No. 9, were examined. On October 22, 1898, John Curran, pilot of the steam tug Charles H. Senff, and Nicholas Geneo, a laborer employed on a float which steam tug No. 9 was towing at the time of the collision, were examined. On November 3, 1898, the last witness for the libelant, Lorenzo Sheffer, the pilot of steam tug No. 9, was examined. The witnesses for the owner of the Hoyt, Nathan A. Hull, the pilot of the Hoyt, and Charles H. Brashing, her engineer, were examined on April 28, 1900. On the last-mentioned date the counsel in the case stipulated that the testimony of the witnesses taken on that day and theretofore taken should be used and be applicable to any cross-action that might thereafter be instituted. On March 12, 1901, the Derby Transportation Company filed its cross-libel, and not until June 1, 1903, nearly eight years after the collision, did the libelant in the principal suit file its answer to the cross-libel. This record is certainly a remarkable one. The first witness was not examined until more than 15 months after the date of the collision, and the last two witnesses not until nearly 5 years after the collision. The frailty of the human memory renders it necessary to accept with caution the statements of the witnesses, and to determine nothing as a material fact in the case that is not substantially corroborated by other witnesses, or by circumstances and the common experiences of men. I have carefully studied the proofs in the case, and, without incumbering this opinion with a detailed statement of the testimony of the witnesses, which is in many respects flatly contradictory, the following is a narrative of the facts relating to the case as I now find them:

On August 17, 1895, between 8:30 and 9 o'clock in the morning, the ferryboat Fulton pulled out of her slip on the New York side of the East river, for the purpose of crossing to Brooklyn to her slip there, just below the Brooklyn Bridge. The day was perfectly clear. There was an ebb tide, making it necessary for her to starboard her wheel before leaving the slip, as she was to pass up and across the river. Almost immediately after passing out of her slip, she headed up the river. At the same time the Hoyt was passing up the river 300 or 400 feet from the Brooklyn shore; the river being at this point some 1,500 or 1,600 feet in width. The Hoyt was partially loaded with coal, and was passing up near the Brooklyn shore for the purpose of taking advantage of the slack water and avoiding the necessity of making her way against the strong ebb tide in the middle of the river. She was, however, gradually making her way toward the middle of the river, as she intended to cross it and stop at Pier 28 on the New York side, just below the Brooklyn Bridge, to take on some lumber. She was on the starboard side of the ferryboat Fulton, and therefore had the right of way. She gave one blast of her whistle to the Fulton, indicating her intention of

continuing her course and passing across the Fulton's bow. The Fulton answered the signal with one blast, indicating her intention of complying with the signal of the Hoyt and passing behind the Hoyt. The pilots of the two vessels, therefore, understood and agreed upon the signals. But the Fulton, continuing her course, came so close to the Hoyt that the latter vessel was in imminent peril of being run down, and, as she was crossing the Fulton's bow, her pilot starboarded her wheel, so as to throw her stern away from the Fulton's bow and avoid a collision. By this maneuver of the Hoyt her bow was made to point nearly across the river toward the New York side. The Hoyt had escaped collision with the Fulton, but at this point a new peril presented itself. The libelant's steam tug No. 9 was coming down the river with the ebb tide, and very near to the middle of the river, probably slightly on the Brooklyn side of the middle. She is 90 feet in length. She had in tow, lashed to her starboard side, a car float 214 feet in length. The stern of the float and the stern of No. 9 were about even with each other. Just before reaching the Brooklyn Bridge, or possibly at about the time of reaching it, and just previous to the Hoyt's crossing the bow of the Fulton, the pilot of No. 9 gave to the Hoyt a signal of one whistle, thus indicating that No. 9 intended to pass the Hoyt port to port. The Hoyt gave no response to the signal of No. 9. At the moment of this signal the Hoyt and No. 9 were, as the pilot of No. 9 says, not more than 700 feet apart. Very shortly afterwards, either at the bridge or just below it, No. 9 gave another signal of one whistle to the Hoyt, which was not answered. Very shortly after the second signal had been given by No. 9 she gave a third signal to the Hoyt, which was not answered. At this instant, I am satisfied, the Hoyt was rounding, or possibly had just rounded, the bow of the ferryboat Fulton. Shortly after No. 9 had given her third signal, and, as I think, when the Hoyt was headed across the river as though she intended to pass in front of No. 9, both No. 9 and the Hoyt sounded danger whistles. They were then very near together. It would have been foolhardy for the pilot of the Hoyt to have attempted to cross the bow of No. 9. The pilot of the Hoyt, who had hard starboarded his wheel for the purpose of getting around the bow of the Fulton, now seeing the danger of collision with No. 9, reversed his engine and hard ported his wheel so as to pass on the port side of No. 9, and the pilot of No. 9 hard ported his wheel and gave a jingle bell for full speed, that a collision between the two tugs might be avoided. But these movements were too late. The Hoyt struck No. 9 amidships at an angle of about 45 degrees. Both of the vessels were considerably damaged. No. 9, to the very moment of giving her danger signal, had continued her straight course down the middle of the river at full speed, notwithstanding she had received no answer to any of her signals. This appears from the admissions of the pilot of No. 9, as follows:

"Q. When did you say you blew the second whistle to the Hoyt? A. Off the abutment of the Brooklyn Bridge on the Brooklyn side. Q. What answer

did you get to that? A. I got no answer. Q. You were still going ahead full speed? A. Certainly. Q. Then what did you do? A. I blowed my third long whistle. Q. What? A. I blowed another whistle off the ferry slip. Q. A single whistle? A. Yes, sir, I did—a long whistle. Q. Off which ferry slip? A. Off the Brooklyn Ferry Slip on the Brooklyn side. Q. Which one, the down river slip or the up river slip? A. Oh, it was just after opening [?] the upper slip. I blowed the three whistles not a great ways apart. Q. Were you going full speed? A. Yes, sir. * * * Q. Where were you when you blew the alarm signal? A. Well, it was very shortly after I blowed the last long whistle. She was coming over pretty well then. Q. Still going full speed? A. Yes, sir. Q. When you blew the alarm? A. Yes, sir."

At the time of the accident the regulations for preventing collisions were contained in chapter 354 of the Laws of 1885 (23 Stat. 438). The articles of that act applicable to the case in hand are as follows:

"Art. 15: If two ships under steam are meeting end on, or nearly end on, so as to involve risk of collision, each shall alter her course to starboard so that each may pass on the port side of the other.

"Art. 16: If two ships under steam are crossing so as to involve risk of collision, the ship which has the other on her own starboard side shall keep out of the way of the other."

"Art. 18: Every steamship, when approaching another ship so as to involve risk of collision, shall slacken her speed, or stop and reverse, if necessary.

"Art. 19: In taking any course authorized or required by these regulations, a steamship under way may indicate that course to any other ship which she has in sight by the following signals on her steam whistle, namely: One short blast to mean 'I am directing my course to starboard,' two short blasts to mean 'I am directing my course to port;' three short blasts to mean 'I am going full speed astern.' The use of these signals is optional, but if they are used the course of the ship must be in accordance with the signal made."

"Art. 22: Where by the above rules one of two ships is to keep out of the way, the other shall keep her course.

"Art. 23: In obeying and construing these rules due regard shall be had to all dangers of navigation and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger."

The Pilot Rules for Atlantic and Pacific Coast Inland Waters in force at the time of the collision, necessary to be here referred to, are as follows:

"Rule 1. When steamers are approaching each other 'head and head', or nearly so, it shall be the duty of each steamer to pass to the right or port side of the other; and the pilot of either steamer may be first in determining to pursue this course, and thereupon shall give, as a signal of his intention, one short and distinct blast of his steam whistle, which the pilot of the other steamer shall answer promptly by a similar blast of his steam whistle, and thereupon such steamers shall pass to the right or port side of each other. But if the course of such steamers is so far on the starboard of each other as not to be considered by pilots as meeting 'head and head,' or nearly so, the pilot so first deciding shall immediately give two short and distinct blasts of his steam whistle, which the pilot of the other steamer shall answer promptly by two similar blasts of his steam whistle, and they shall pass to the left or on the starboard side of each other.

"Rule 2. When steamers are approaching each other in an oblique direction (as shown in diagram of the fourth situation) they shall pass to the right of each other, as if meeting 'head and head', or nearly so, and the signals by whistle shall be given and answered promptly, as in that case specified."

Article 16 of the above-mentioned regulations shows that, as between the ferryboat Fulton and the Hoyt, the latter was the

privileged vessel, and it was the duty of the Fulton to keep out of the way of the Hoyt. She did not do so. As between the steam tug No. 9, which was going down the river on the Brooklyn side of the middle thereof, and the Hoyt, which was passing up the river nearer to the Brooklyn side, but gradually making her way out toward the middle of the river, it is clear that No. 9 and the Hoyt were meeting "nearly end on, so as to involve risk of collision." By article 15 of the regulations it was therefore the duty of each, if nothing had intervened to prevent it "to alter her course to starboard, so that each might pass on the port side of the other." By rule 1, above given, the pilot of No. 9 had the right to give a signal of one blast, indicating his intention to pass the Hoyt on her port side. But before No. 9 and the Hoyt had passed each other, a "special circumstance" intervened which, by the provisions of article 23, rendered a departure from article 15 and rule 1 necessary in order to avoid immediate danger to the Hoyt. The day was clear. When the pilot of No. 9 blew his first signal, he was not more than 700 feet from the Hoyt. The Hoyt and the Fulton were therefore in his full view, and, if he had been reasonably attentive to his duty, he must have seen the danger which suddenly confronted the Hoyt and produced the "special circumstance" which rendered a departure from the usual rules necessary. The pilot of No. 9 blew three signals without receiving any reply from the Hoyt. By continuing on his course at full speed he incurred serious risk of collision. In such circumstances, article 18 made it his duty to slacken his speed, or to stop and reverse if necessary. I have no difficulty in reaching the conclusion that the collision would not have occurred if the pilot of No. 9 had followed the regulations and managed his vessel with reasonable prudence. The Hoyt was properly proceeding in her course until she faced the danger of a collision with the Fulton. By force of article 22 the Hoyt was bound to keep her course. The effect of the decision in The Britannia, 153 U. S. 139, 14 Sup. Ct. 795, 38 L. Ed. 660, in construing a similar regulation, is that the pilot of the privileged vessel must continue his course without assuming that the obligated vessel will not yield to him in accordance with the signals already exchanged. In The Delaware, 161 U. S. 459, 16 Sup. Ct. 516, 40 L. Ed. 771, it appears that two vessels, the Delaware and the Talisman, were approaching each other on crossing courses. The Talisman was on the starboard side of the Delaware. The Delaware was therefore bound to keep out of the way and the Talisman to keep her course. The Delaware continued on her course, and struck and sunk the Talisman. The Delaware was, of course, at fault. It was insisted that the Talisman was also in fault, it appearing that, when the Delaware was about a mile off, the Talisman blew a single blast of her whistle, which was not answered; that, when the Delaware was a quarter to an eighth of a mile off, she sounded another single blast, which was not answered; and that, when the Delaware was about a length off, the Talisman sounded an alarm signal, but did not change her helm or reduce her speed before the collision. It

was charged that the Talisman ought to have stopped and reversed her engine when the failure of the Delaware to take measures to avoid her became apparent. In commenting upon this point, the court said:

"In The Britannia, 153 U. S. 130, 14 Sup. Ct. 795, 38 L. Ed. 660, which was also a case of starboard hand collision, the preferred steamer, the Beaconsfield, was held to have been in fault for stopping and reversing under similar circumstances: in other words, for doing what it is claimed the Talisman should have done in this case. Two members of the court dissented, upon the ground that the Beaconsfield, having been brought into a position of peril by the negligence of the Britannia, was not in fault for stopping and reversing; the substance of their opinion being that, under such circumstances, the master might exercise his judgment as to the best method of avoiding a collision, and that an error in judgment should not be imputed to him as a fault. In neither opinion, however, was it intimated that, if the Beaconsfield had kept her speed, she would have been in fault for so doing."

It was held that the cases of The Britannia, supra, and The Northfield, 154 U. S. 629, 14 Sup. Ct. 1184, 24 L. Ed. 680, settled the law that the preferred steamer will not be held in fault for maintaining her course and speed so long as it is possible for the other to avoid her by porting, at least in the absence of some distinct indication that she is about to fail in her duty. The court further said:

"If the master of the preferred steamer were at liberty to speculate upon the possibility, or even of the probability, of the approaching steamer failing to do her duty and keep out of his way, the certainty that the former will hold his course, upon which the latter has a right to rely, and which it is the very object of the rule to insure, would give place to doubts on the part of the master of the obligated steamer as to whether he would do so or not, and produce a timidity and feebleness of action on the part of both, which would bring about more collisions than it would prevent."

The conclusion reached was that there was too much doubt about the fault of the Talisman to justify the court in apportioning the damages. The decision in the case of The Delaware makes it clear that the Hoyt was not at fault in continuing on her course in accordance with the signals exchanged between her and the Fulton. The peril of a collision between the Hoyt and the Fulton justified the pilot of the Hoyt in starboarding his wheel so as to throw the stern of the Hoyt away from the bow of the Fulton, even though by this maneuver the bow of the Hoyt was pointed directly across the course of No. 9. In this maneuver the pilot of the Hoyt was not at fault.

But in another respect I think he was at fault. He admits that he heard at least two of the signals of No. 9, and that he answered neither of them. If his tug, at both of the times when he heard the signals of No. 9, was in such imminent peril of a collision with the Fulton as to excuse him for his failure to answer those signals, or either of them, he should have shown it. His silence on this point must be construed against him. He says that when he was directly across the Fulton's bow No. 9 was 400 or 500 feet away from him; that when No. 9 gave her last signal of one blast she was 300 or 400 feet away from him; that he was not going fast; that No. 9 and the Hoyt each blew a danger signal, but that he is uncertain which one first gave such signal; and that he, about the time

of giving his danger signal, reversed his engine. He also testified as follows:

"Q. When you sent down the bells to reverse your engines, where were No. 9 and the car float? A. Oh, I should judge they were three or four hundred feet to the eastward of me up the river. Q. On which hand? A. They were on my starboard hand as I was then; they were on my starboard hand as my boat was in that position. Q. How much on your starboard hand? A. Oh, they were a good deal on my starboard hand."

He has failed to show that, after passing the point of danger of collision with the Fulton, he acted with promptness in the discharge of a plain duty to No. 9. It is clear that he heard at least one of the signals of No. 9 before crossing the bow of the Fulton, and that he had failed to respond to that signal. With the proof of such neglect of duty and violation of the navigation rules before me, he is not entitled to any presumptions in his favor. Indeed, inasmuch as he says that, after rounding the bow of the Fulton, No. 9 was a "good deal" on his starboard hand, the question arises whether, instead of hard porting his wheel so as to pass on the port side of No. 9, he should not have starboarded his wheel and passed down the river, thus giving No. 9 a better opportunity, by starboarding her course, to escape danger. As the pilot of the Hoyt has failed to make this point clear, and as, by failing to respond to the first signal of No. 9, he had inexcusably violated article 15 and rule 1, above quoted, I conclude that he ought to be held jointly responsible with the pilot of No. 9 for the accident.

The damages, therefore, must be divided between the two vessels. In the old admiralty practice of England there was a question as to whether, when two vessels were both at fault in a collision, the damages should not be apportioned according to the degree of fault. But the rule in the English practice is no longer in doubt. In Cayzer v. Carron Company, 9 App. Cas. 881, Lord Blackburn said:

"When the cause of the accident is the fault of both, each party being guilty of blame which causes the accident, there is a difference between the rule of admiralty and the rule of common law. The rule of common law says, as each occasioned the accident, neither shall recover at all, and it shall be just like an inevitable accident; the loss shall lie where it falls. Admiralty says, on the contrary, if both contributed to the loss, it shall be brought into hotchpotch and divided between the two. Until the case of Hay v. Le Neve [2 Shaw, App. 395], which has been referred to in the argument, there was a question in the admiralty court whether you were not to apportion it according to the degree in which they were to blame; but now it is, I think, quite settled, and there is no dispute about it, that the rule of the admiralty is that if there is blame causing the accident on both sides they are to divide the loss equally, just as the rule of law is that if there is blame causing the accident on both sides, however small that blame may be on one side, the loss lies where it falls."

This rule has been frequently recognized in the admiralty courts of this country, and especially in the case of The North Star, 106 U. S. 17, 1 Sup. Ct. 41, 27 L. Ed. 91.

There will be an interlocutory decree that the vessel which received the greater damage shall recover from the other one-half of the difference between the amounts of their respective losses. This is in accord with the rule stated in The Manitoba, 122 U. S.

111, 7 Sup. Ct. 1158, 30 L. Ed. 1095. There will also be a reference to a commissioner to take proofs for the purpose of ascertaining the amount which shall be assessed in favor of the vessel receiving the greater damage.