## THE CITY OF CAMDEN.
## THE TRITON.

### WILMINGTON STEAMBOAT CO. et al. v. GULF REFINING CO. et al.

#### No. 4403.

Circuit Court of Appeals, Third Circuit.
Aug. 19, 1930.

Rehearing Denied Dec. 9, 1930.

Lewis Adler & Laws and Otto Wolff, Jr., all of Philadelphia, Pa., for appellants.

Howard M. Long, of Philadelphia, Pa., for appellee Quillen.

George S. Wolbert, of Philadelphia, Pa., and Burlingham, Veeder, Fearcy, Clark & Hupper, of New York City (Chauncey I. Clark and P. Fearson Shortridge, both of New York City, of counsel), for appellee Gulf Refining Co.

Before BUFFINGTON, Circuit Judge, THOMSON and THOMPSON, District Judges.

THOMPSON, District Judge.

In the court below, the Gulf Refining Company, owner of barge Monessen, filed its libel against the steamboat City of Camden and the tug Triton in a cause of collision. The collision occurred on the Delaware river on the afternoon of July 15, 1926, while the Triton was towing the Monessen, loaded with fuel oil, to be supplied to the steamship Steel Mariner, which was lying at Pier 98, South Wharves. The Triton had her tow lashed to her port side, stern first, and proceeded up the river along the eastern side of the channel, which, in the immediate neighborhood of Pier 98, is about 1,000 feet in width. The Monessen was a square-end tank barge about 200 feet long, and about 100 feet of her length projected beyond the bow of the tug. The tide was flood, with a current of about

three miles an hour. It was raining, but there was no fog or hazy condition. Upon arriving about 1,000 feet south of Pier 98, the tug rounded her tow to port, crosswise of the channel, stopped her engines, and drifted up stream with the tide preparatory to putting her tow into the slip between Pier 98 and Pier 96. Meanwhile, the steamboat City of Camden was coming down the western side of the river and was observed by those on the tug when approximately 2,000 feet away. In the position in which the tug and her tow were in the river, those on the Triton could readily see that the City of Camden was on the starboard side of the tug and was on her course down the river. The tug, after observing the relative positions of the two vessels, started her engines with the intention of placing her tow in the slip.

Pier 98 extends further into the river than pier 96 immediately north of it, and, when the Triton observed the City of Camden, there was ample space for the City of Camden to continue on her course between the stern of the barge and the piers. The Triton, however, proceeded with her tow for the slip. There was no evidence that the slip into which she was taking her tow was one in which she was usually moored, nor was there any action on the part of the tug to indicate to the City of Camden, when it was a safe distance away, that the Triton was doing anything more than drifting up stream with the tide preparatory to making across the channel. When about 1,000 feet above the tug and her tow, the City of Camden blew one blast upon her whistle, indicating her intention of continuing her course and speed. The Triton responded with two blasts; and the City of Camden, seeing that the tug and tow were crossing her bow, reversed her engines; but too late to avoid a collision. The City of Camden's bow struck the side of the barge about 10 feet from her stern, which was within the slip, causing damage to the barge.

Under these facts the learned judge of the court below held that the City of Camden was at fault. The case was decided upon the conclusion that the crossing rule—article 19 of the Pilot Rules (33 USCA § 204)—did not apply to the facts in the case, but that it was a case of special circumstance under article 27 (33 USCA § 212), and this, notwithstanding the fact found in the opinion, that the Triton observed the City of Camden when she was approximately 2,000 feet away.

Article 19 provides: "When two steam-vessels are crossing, so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other." It is apparent from the facts found by the trial judge that, when the City of Camden was 2,000 feet away, the tug, with her tow, was drifting up stream, lying diagonally across the channel and had the City of Camden on her starboard side. The Triton was therefore the burdened vessel, and the duty on her part was to keep out of the way of the other vessel. The duty of the City of Camden was, under article 21 (33 USCA § 206), to keep her course and speed; and that is what she did.

■ There is no evidence in the case, nor were any facts found by the trial judge through which it could be found that the Camden had notice that the tug, with her tow, were about to enter the slip. When a vessel is leaving her dock she gives notice thereof, if she performs her duty, by a long blast of her whistle, and knowledge that the vessel is about to leave dock or is maneuvering preparatory to getting on her course has usually been held ground for application of the Special Circumstance Rule 27.

We think the trial judge erred in his conception of the duty of the Triton, under the facts found as to the distance between the two vessels after the City of Camden was first observed by the Triton, and in placing too much stress upon the intention of the Triton to navigate into the slip after she had observed the City of Camden, in consequence of which she started her engines and deliberately placed herself in a position of peril during the time which it took the City of Camden to close up the distance of safety between the vessels.

■ The rules impose a duty and a burden upon the vessel having the other upon its starboard side, and they place a duty upon the privileged vessel. When the Triton saw the City of Camden coming down the river upon the tug's starboard side, the duty was placed upon her to keep out of the way of the other vessel. She was then drifting with the tide, and her clear duty was not to cross the course of the privileged vessel. If she had reversed her engines, or continued to drift, there would have been ample space for the City of Camden to pass between the stern of the barge and the end of the pier, and the collision would, no doubt, have been avoided. Under article 21 it is provided that the privileged vessel shall keep her course and speed. The obligation imposed by the starboard hand rule upon the privileged vessel is thus stated

in The Delaware, 161 U. S. 459, 16 S. Ct. 516, 521, 40 L. Ed. 771: "The cases of The Britannia, 153 U. S. 130, 14 S. Ct. 795, 38 L. Ed. 660, and The Northfield, 154 U. S. 629, 14 S. Ct. 1184, 24 L. Ed. 680, must be regarded, however, as settling the law that the preferred steamer will not .be held in fault for maintaining her course and speed, so long as it is possible for the other to avoid her by porting; at least in the absence of some distinct indication that she is about to fail in her duty. If the master of the preferred steamer were at liberty to speculate upon the possibility, or even the probability, of the approaching steamer failing to do her duty and keep out of his way, the certainty that the former will hold his course, upon which the latter has a right to rely, and which it is the very object of the rule to insure, would give place to doubts on the part of the master of the obligated steamer as to whether he would do so or not, and produce a timidity and feebleness of action on the part of both, which would bring about more collisions than it would prevent. * * *"

We have the duty of each of the vessels in a crossing case clearly defined under articles 19 and 21, and if, in cases in which those duties are imposed, the courts steadfastly adhere to the ruling that speculation as to movements of the other vessel and the taking of chances based upon speculation are not to justify a violation of the rules, the number of collision cases will probably decrease. The Delaware, supra.

Resort to article 27, known as the Special Circumstance Rule, is, quite customarily, had as a justification for failure to obey rules which are mandatory in their terms. We fail to see that there were any special circumstances here which would justify a vessel in deliberately starting and maintaining a course across the bow of another vessel after she perceived the other upon her course 2,000 feet away, where she, herself, was the burdened vessel. The City of Camden was proceeding according to the rules, and the Triton was deliberately insisting upon a mode of navigation contrary to the rules. The Triton was so grossly at fault that the law puts on her the duty of showing clearly that the City of Camden was at fault. The Victory and Plymothian, 168 U. S. 410, 18 S. Ct. 149, 42 L. Ed. 519.

There is no preponderance of evidence here against the City of Camden. It is not shown that she had any notice, until too late, that the Triton intended to put the Mones-sen into any particular slip, and it is not shown that the Triton could not have reversed her engines and stopped what little headway she had when she clearly saw the other vessel on her starboard bow 2,000 feet up the river. We think the learned judge erred in putting the burden of keeping out of the way upon the City of Camden instead of upon the Triton where it rightfully belonged. We conclude that the City of Camden was not at fault for maintaining her course and speed, and that the Triton was solely at fault in not keeping out of the way. The decree in favor of the libelant and against the Wilmington Steamboat Company, claimant and owner of the City of Camden, and its stipulator, and dismissing its libel against the tug Triton, will be reversed, and it is ordered that a decree be entered for the libelant against the tug Triton, and its stipulator, for damages to the Monessen with interest and costs.