## THE BARRANCA (two cases).

## THE SAN PASQUAL.

District Court, E. D. Louisiana, New Orleans Division. May 31, 1927.

Nos. 17926, 17974.

**1. Collision 95(1)—Steamship in tow held in fault for collision on Mississippi with another on crossing course.**

Collision on the Mississippi at New Orleans between a steamship coming up near the east shore and another in tow swinging to head downstream, and at the time on a crossing course, *held* due solely to the fault of the latter in failing to keep out of the way, as required by exchange of signals, and failing to sound alarm signals, when there was danger that she would not clear.

**2. Collision 115—Tug hired to furnish motive power only to a dismantled steamship made fast alongside and acting under orders of master and pilot of ship, held not responsible for movements of the tow.**

A tug hired to furnish motive power only to a steamship from which the propelling engines had been removed, but which still retained steam to operate her steering gear, and was in charge of a master and pilot, who controlled her movements and gave orders to the tug, made fast alongside, *held* the agent of the ship which as principal was responsible for the movements of the tow.

**3. Collision 115—Tug alongside, which followed orders of the pilot on the ship, held not responsible for collision.**

A tug hired to furnish motive power only to a steamship, and made fast to her port quarter, *held* not negligent in making fast on the port instead of the starboard side, nor responsible for a collision, where the ship was in charge of her own pilot, who directed her movements and gave orders to the tug, which were obeyed.

**4. Collision 115—Contract to furnish motive power only held to impose no responsibility on tug for movement of tow.**

A contract to furnish motive power only to a partially dismantled steamship *held* to impose no responsibility on the tug for movement of the tow.

In Admiralty. Suits for collision by the United States against the steam tug Barranca and the Steamship San Pasqual, and by the Old Time Molasses Company, claimant of the San Pasqual, against the tug Barranca and the New Orleans Coal & Bisso Towboat Company, owner. Decree for United States against the San Pasqual only, and for respondents in the second suit.

Edouard F. Henriques, Sp. Asst. in Admiralty to U. S. Atty., of New Orleans, La., James W. Ryan, of New York City, and Eugie V. Parham, of New Orleans, La., for Old Time Molasses Co. and the San Pasqual.

James W. Ryan, of New York City, Eugie V. Parham, of New Orleans, La., and Bigham, Englar & Jones, of New York City, for libelant.

Philip S. Gidiere (of Spencer, Gidiere, Phelps & Dunbar), of New Orleans, La., for New Orleans Coal & Bisso Towboat Co.

BURNS, District Judge. Libelant, as owner of the steamship Colorado Springs, claims damages resulting from a collision with said vessel by the respondent tug Barranca and its tow, the steamship San Pasquale, in the Mississippi river at New Orleans, at or about 5:45 o'clock a. m., on February 14, 1923.

[1] The Colorado Springs was coming up the river along the east bank, showing proper lights, and sighted, at or about one mile off and over toward the west bank, the starboard light of the San Pasqual. The river is somewhat more than a half mile wide in that reach. The Colorado Springs sounded a one-blast signal and received a one-blast signal in return. She therefore held her course and speed along the east bank, on a star-

board helm, as she was bound to do under rule IX of the Pilot Rules for the Rivers Whose Waters Flow into the Gulf of Mexico. There was nothing apparent, nor any alarm signal, to indicate any misunderstanding, or objection, or inability of the San Pasqual to comply with the exchanged signals preceding the collision, which occurred when the San Pasqual came head into her at her port quarter.

The San Pasqual was a steamship of concrete hull construction, which had been bought of the government by the Old Time Molasses Company. Her propulsion engines had been dismantled by the owner, with the intention of using her for the storage of molasses at Santiago, Cuba. Two of her boilers had been retained intact for donkey purposes, to operate her winches and anchors and steam steering gear. She was manned by a licensed Norwegian master and eight men, including two engineers, and a regular, compulsory Mississippi river pilot, who directed her operation and navigation from her bridge. She was in tow of the steam tug Barranca, belonging to the New Orleans Coal & Bisso Towboat Company, which was under contract to tow her to Santiago.

The Barranca had come alongside during the night of February 13th, and made fast to her port stern quarter as she lay at anchor, stem upstream, some 400 or 500 feet off shore near the west bank of the river. Upon arrival of the river pilot, he went aboard the San Pasqual, taking his usual position on the ship's bridge, where, together with the ship-master and an helmsman at the wheel, he proceeded to direct the movement of the vessel, which depended for motive power on the tug Barranca. His orders were given directly to the helmsman for the maneuvering of the ship, and those for propulsion were given the tug captain, some personally by the pilot and some relayed by him through the ship-master, for which purpose they called down to the tug captain over the stern port side of the ship's bridge. His first order was to weigh anchor, for which purpose the ship moved ahead upstream. The anchor being weighed, she began swinging to starboard, flanking the river. Finding that she was swinging in too wide a circle, and being then at or past midstream, he ordered the tug full speed astern.

It was at this point, when in or about a right angle position, he received the one-blast signal from the Colorado Springs, whose port light he saw clearly; the night or early morning being dark, but clear, and weather fine. His starboard light was pre-

sented to the other ship. In that position he accepted the port to port passing signal from the approaching vessel, by one blast, which he ordered the tug captain to give with the tug whistle. The ship, being a heavy tow, did not take up sternway as he expected or estimated, with the tug full speed astern. Instead she moved down with the current and across toward the east bank, piling into the Colorado Springs on the port side of that vessel at or about the No. 4 hold or mainmast section, near her stern quarter. The pilot on the Colorado Springs realized the danger of collision, which had also been seen by his lookout on the bow, just before she struck. He then attempted to swing that ship, which had been on a starboard helm, to port, in an effort to sheer clear of the San Pasqual or minimize the force of the blow.

The pilot of the San Pasqual was asked why he did not give the danger signal when he realized that he could not comply with his port to port signal, and that he could not pass under the stern of the Colorado Springs, as he was obligated by the signal to do. He said he did not realize the danger of collision until the other vessel was right upon him. He did not blow a danger signal because "it was too late. I was in a position where I was busy turning the ship in the river, a heavy tow, and it kept me busy running back and forth and looking out for that tow, and I could not look out for a ship coming up the river at the same time. That was an impossibility. I had the ship broadside on the river, and practically against the current, and I had everything against me." He also admits having given the other ship the right of way by the exchanged signal, and that it was his duty to keep clear of her, and that he had failed to do so.

Clearly there was no breach of the rules or of good seamanship on the part of the Colorado Springs. After the exchange of signals, she had not only the right, but owed the duty, to keep her course and speed. The situation of the vessels brought them precisely within the terms of rule IX of the Pilot Rules for the Rivers Whose Waters Flow into the Gulf of Mexico, etc., because the two steamers were approaching each other, either at right angles, or obliquely, and the San Pasqual had the approaching vessel on her own starboard side, whereas the Colorado Springs had the San Pasqual on her own port bow. She had blown one blast of her whistle as a signal of her intention to cross the bow of the other, holding her own course and speed, which signal had been promptly answered by the San Pasqual by one short blast

of the tug whistle as a signal of her intention to direct her course to starboard, so as to pass port to port, or go under the stern of the other, or otherwise keep clear. These passing signals had been exchanged before they had arrived at a distance of one-half mile of each other.

Proctors for the San Pasqual, in contending that the Colorado Springs is liable for the collision, insist that special circumstances had arisen, presuming thereby to bring the case under pilot rule II, and within the scope of a number of judicial decisions, where that rule or similar rules were applied upon a doctrine similar to that of last clear chance in the law of torts; but there is nothing to justify this contention. The duty lay with the pilot on board the San Pasqual to have realzed in time his inability to comply with the exchanged signals, and to have made this apparent to the other vessel at once by blowing the alarm signal, so that it might be warned to stop and back, if necessary, pursuant to the concluding provision of rule IX, which reads:

"* * * If from any cause whatever the conditions covered by this situation are such as to prevent immediate compliance with each other's signals, the misunderstanding or objection shall be at once made apparent by blowing the alarm signal, and both steamers shall be stopped, and backed if necessary, until signals for passing with safety are made and understood."

The San Pasqual was the obligated steamer. The Colorado Springs, as the preferred steamer, in the absence of such alarm signal, had no indication or apparent reason to suspect that the obligated steamer would not discharge her obligation, under the port to port signal, to pass under her stern or otherwise keep out of the way. The Delaware, 161 U. S. 459, 16 S. Ct. 516, 40 L. Ed. 771; The Britannia, 153 U. S. 130, 14 S. Ct. 795, 38 L. Ed. 660; The Victory and the Plymothian, 168 U. S. 410, 18 S. Ct. 149, 42 L. Ed. 519; The Wolsum, 14 F.(2d) 376 (5th C. C. A.). The libelant, therefore, is clearly entitled to a decree in its favor.

[2] The important question remaining is whether the San Pasqual and the Barranca are both liable for the damage, or, if not, which of the two should be held liable. The Old Time Molasses Company, as owner and claimant of the San Pasqual, alleges by its answer that the collision was due to the fault of the Barranca and the steamship Colorado Springs. It has also filed a libel (docket No. 17,974, submitted herewith) against the Barranca and the New Orleans Coal & Bisso

Towboat Company, as owner, claiming certain damages sustained by the San Pasqual, and contending that, under the contract for towage between the latter company and itself, the tug Barranca was in abolute control of the San Pasqual, which she took in tow and negligently damaged by bringing her in collision with the Colorado Springs; that the tug was lashed to the port side, instead of to the starboard side, of the ship, which it persistently calls a barge; that she failed to turn the San Pasqual's head to starboard, and so failed to pass the Colorado Springs port to port, according to the signals exchanged; that the Barranca had been registered foreign for the purpose of the trip, and that the river pilot, whose services are compulsory under the state law, was really in charge of the tug, and that the San Pasqual was really a dumb barge in its tow.

The respondent tug Barranca and its owner deny negligence generally, and deny liability for any loss or damage under the contract. They contend that the contract relieved them of all responsibility for loss or damage during the period of the towage. They allege that the owners of the San Pasqual, pursuant to the contract of towage, furnished the master and crew of the ship, as well as their subsistence, and were to pay for all port charges, pilotage, and tonnage dues on both the tug and the tow, both at New Orleans and at Santiago, Cuba; that the San Pasqual was in charge of her own master and crew, and of the river pilot, whose orders were implicitly obeyed; that the tug merely furnished motive power according to its contract; that throughout the period of the operations preceding the collision the tug captain and those on board the tug could not see over the high side of the ship, to which the tug was lashed.

[3] Before proceeding to a consideration of the relation of the tug to the tow, it is necessary to consider the charges of negligence against the tug, made on behalf of the San Pasqual and its owners. There is no dispute in the evidence concerning the maneuvers of the tug and tow. The principal charge made against the tug is that she was hooked up to the ship in the wrong position; that is, that she should have been lashed to the starboard stern quarter, instead of the port stern quarter. The tug captain (Eckhoff, page 39), examined upon this point, denied this charge, and I do not find any satisfactory evidence to contradict him. An attempt was made to sustain the charge during the cross-examination of the mate of the tug, who was finally induced to say that he would have

hooked the tug up on the starboard quarter if he had been master of the tug.

This chance statement of the mate, who testified to the tendencies of the tow to swing to port or starboard, as the tug might move ahead or astern, coupled with the fact that the tug had been put astern when the pilot found he was swinging past midstream in too wide a circle, is pounced upon by proctors for the San Pasqual, who quote copiously from Knight on Seamanship (7th Ed.) much elementary learning on general principles of seamanship. Such text has little value for present purposes, because, while the principles of navigation may be correctly described therein, the text-writer does not take into account local and particular conditions under which vessels operate in practice. It is to be assumed that the local tugmasters, duly licensed as such, and the local pilots on the Mississippi river, know the rudimentary principles defined by the text-books, and know, what is more important, the exact condition, location, and tendencies of the current and eddies in the Mississippi river at the local points, where they function daily, depending no less upon their local experience in daily practice than upon mere theory.

In the instant case there is nothing to indicate that the tug captain acted improperly in making fast alongside the port quarter of this ship, which was then lying near the west bank of the river below Algiers Point. There was no necessity for haste on his part, and he seems not to have acted hastily or carelessly. He was tied alongside some eight hours before the river pilot came on board. The Norwegian shipmaster, licensed as such for more than 30 years, was aboard of and in charge of the San Pasqual, and he made no compliant of the tug's location; nor did the river pilot complain, when he came aboard and assumed actual charge of the tug and tow. The first direction taken by the ship was ahead, when the pilot ordered the anchor to be heaved. Upon pushing her ahead, the tendency of the tug pushing on the port quarter was to throw the stern to port and give the stem a starboard direction. This was the direction in which the ship was intended to turn, and did turn, until she flanked the river at right angles. Had she continued swinging or turning downstream, as was, no doubt, intended she should, the position of the tug on the port quarter would have accelerated the tendency in that direction, and it was therefore actually putting the recognized theory of the text-books into practice. It was only when the pilot in charge realized that he had opened too wide a circle and got past mid-river that he decided to order the tug to go astern.

The collision resulted from the pilot's failure to swing early enough, or to realize his position in the river, after opening too wide a circle, and order the reverse movement in time to take up sternway, that caused the collision. Nor did the position of the tug, because of its failure to see the approaching ship, on the starboard side, cause the collision. She was seen by the pilot and master from the bridge of the San Pasqual. This was all that was necessary. It made no difference whether the tug captain saw her or not. The sole purpose of the tug was to furnish motive power, and the operation and maneuvers followed the orders given from the bridge of the ship. There was no more necessity for the tug captain to see the ship than for its own engineer to do so, had its own engine room been furnishing the motive power. On this point, therefore, I find that the tug was guilty of no negligence.

A contention of about equal merit is made because the port anchor had been removed from the San Pasqual in anticipation of using the anchor chain in connection with the tow hawser after the vessel should have proceeded down the river into the open Gulf. The absence of this anchor clearly had no relation to the operation of the vessel or of the tug, and contributed in no way to the collision that followed.

So, too, there is nothing to sustain the charge that the tug was not of sufficient power to tow the vessel. I find that the tug was an entirely seaworthy and suitable vessel for the undertaking, properly manned and equipped, and that she was competently handled in good seamanlike manner. It follows necessarily that the collision resulted from fault in the navigation and maneuvering of the San Pasqual by the pilot and master of that vessel.

[4] Determination of liability for the damage resulting from the collision, nevertheless, turns upon the relation between the tug and its tow. In an opinion written by the late Circuit Judge Pardee, in the case entitled In re Walsh et al., 136 F. 557 (C. C. A. 5th), it was held that a tug employed solely to furnish motive power to another vessel, to whose side she is lashed, and which is in all things with respect to the navigation of the fleet subject to the orders of a pilot employed by and on board of the tow, is not liable for a collision occurring without her own fault, although it may have been caused or contributed to by the fault of the pilot or of the tow.

In that case, like this, the colliding fleet was composed of a schooner type vessel, known as a tank or oil barge, in tow of a steam tug (along with other barges). The tug was lashed alongside the schooner's starboard quarter, and because of the high side of the ship the tug was out of view of the vessel collided with. But there was no fault on the part of the tug, and the fleet was in charge of a regular Mississippi river pilot employed by the owners of the ship. He directed and commanded the navigation of the fleet from his position on the cabin of the ship. It was held that the tug was without fault and her master had been guilty of no faulty navigation. He had received orders from the pilot on the ship, and obeyed all orders as to navigation, and, further than obedience to such orders from the pilot, he took no part in the navigation of the fleet. Thence the court proceeds to a careful consideration of the Supreme Court's decision in Sturgis v. Boyer, 24 How. 110–121, 16 L. Ed. 591, quoting the Supreme Court to the following effect:

"Cases arise, undoubtedly, when both the tow and the tug are jointly liable for the consequences of a collision, as when those in charge of the respective vessels jointly participate in their control and management, and the master or crew of both vessels are either deficient in skill, omit to take due care, or are guilty of negligence in their navigation. Other cases may well be imagined when the tow alone would be responsible, as when the tug is employed by the master or owners of the tow as the mere motive power to propel their vessels from one point to another, and both vessels are exclusively under the control, direction, and management of the master and crew of the tow. Fault in that state of the case cannot be imputed to the tug, provided she was properly equipped and seaworthy for the business in which she was engaged, and, if she was the property of third persons, her owners cannot be held responsible for the want of skill, negligence, or mismanagement of the master and crew of the other vessel, for the reason that they are not the agents of the owners of the tug, and her owners in the case supposed do not sustain towards those intrusted with the navigation of the vessel the relation of the principal."

Following this, Judge Pardee said that Sturgis v. Boyer has been cited approvingly and followed in many cases in the admiralty courts. He refers to Winslow's Digest, vol. 3, p. 4837, and says that the same principles for determining the responsibility as between tug and tow had been cited in text-books, which he names, and followed generally in the admiralty courts, citing cases. Finally, he refers to an opinion by Justice Blatchford, then District Judge, in The Edgar Baxter, 8 Ben. 162, Fed. Cas. No. 4,278, whom he quotes as follows:

"The evidence shows that the movements of the propeller were under the direction of a pilot who was on board of, and belonged to, and was in the employ of, the schooner. The tug furnished only the motive power, while the guidance of the two vessels, considered as one in their relations to other vessels, the schooner being lashed alongside of the tug, was under the direction of the schooner, through such pilot. Under those circumstances the tug is not liable for the damage complained of in this case, and the libel must be dismissed, with costs."

Proceeding further, Judge Pardee recites that:

"On principle, and after full consideration of the subject in the light of the text-books and adjudged cases, we concur with Parsons [on Shipping and Admiralty, vol. 1, p. 534]: 'The question has arisen, when a vessel is in tow of a steam tug, and collision occurs with another vessel, which is responsible, the steam tug or the vessel in tow? It is obvious that two perfectly distinct views may be taken of the relation between them. According to one, the vessel towing is but the servant of that which is towed; this latter is the master, and is responsible for the acts of the former as his servant. According to the other, the vessel towed is for the time under the absolute control of the vessel towing, and this latter is therefore responsible for any mischief done. We apprehend it to be an error to assume that either of these relations must exist in any particular case. The inquiry should always be: Which party is the principal, and which the servant? And, wherever the relation of principal and agent exists, the case should be decided on the principles of agency. Generally we should say that the tug was probably the servant, and the vessel which employed her the principal, and responsible as such. But it will be seen that the cases are in irreconcilable conflict.' "

In the Walsh Case, supra, the tug was held to be the servant and the ship the principal. This case, in its material parts, is so nearly identical with the Walsh Case that, upon the same principles, I am likewise disposed to hold the Barranca to be the servant, and the San Pasqual the principal, and responsible as such. The fact that the San Pasqual was actually in charge of a regular mas-

ter and crew, and actually operated for the owners by them, and by a compulsory river pilot from her bridge, using the tug merely for motive power, seems conclusive of her responsibility.

Proctors for the San Pasqual and its owners, in an effort to place the blame on the tug, strenuously contend that the tug Barranca and its captain were actually in control; that its owners had contracted to tow, transfer, and deliver the ship (which, in their brief, they persistently call a "dumb barge," merely because her propulsion engines were down) to Santiago; that the Barranca's owners had full control of, and had actually hired the crew of, the ship, and that the river pilot was actually the pilot of the Barranca and not of the San Pasqual; that there should have been two river pilots hired, instead of one; that the tug captain should have been on the bridge of the ship, where he could see, instead of in the tug's wheelhouse, where he could not, etc.

I find much of the argument made in support of these contentions merely specious or colorable. The metamorphosis of a large steamship, even though her engines are dismantled, cannot be accomplished, in fact, by the persistent use of the term "dumb barge" in a lawyer's brief; nor can a licensed Norwegian shipmaster of 36 years' experience on steam and sailing vessels be unlicensed, along with his crew of eight men, including two marine engineers, nor be changed in character by a declaration in a brief that the tug captain, the mate, and the river pilot were the only licensed officers, the first two of whom were "hidden together in the tug's pilothouse"; nor can the extinguishing of the anchor light of the ship, after heaving the anchor and using her running lights, make her a "dumb barge" and "demonstrate that the tug," using her towing lights according to the pilot rule, "regarded herself, not as motive power astern and under control of the barge, but as the dominant controlling mind or steamer, nor does the obedient blowing of a signal by the tug captain, on the order of the pilot in charge on the ship's bridge, constitute "dangerous and grossly negligent action" on the part of the tug captain; nor is he made both "blind and inattentive" because he is in his tug's wheelhouse, where he belongs, and does not climb up on the bridge of the "dumb barge," where he does not belong; nor does this failure to anticipate the lawyer's brief make it apparent that "he believed his mate incompetent and untrustworthy" to be left in charge of the tug, etc.

However, a careful examination of some 20 letters and telegrams, filed in the record, and the oral testimony describing the negotiations for the towing of the San Pasqual is necessary to ascertain, if possible, what the precise contractual relation between the tug and tow owners was. These are too numerous and lengthy to be set out here in full. They also contain extraneous negotiations for other contemporaneous towage service. Stripped of irrelevancies, I find that the Tankers' Corporation, a brokerage concern of New York, acting for the Old Time Molasses Company, of Cuba, solicited the New Orleans Coal & Bisso Towboat Company, of New Orleans, for the towage of the San Pasqual from New Orleans to Santiago, Cuba. Communication began with a telegram, dated January 2, 1925, offering $4,000. The correspondence included long-distance telephone conversations relating to details, principal among which was a misunderstanding as to whether the tugowners or the shipowners, called the charterers of the tug throughout, were to furnish and find the ship's crew.

In the first offer made, the Tankers' Corporation stipulated that the Towboat Company furnish the crew. In their first reply, the Towboat Company insisted, in addition to the $4,000 price, that the charterers pay all port charges for tug and tow at both New Orleans and Santiago, arrange for transfer of crew, install additional lifeboat on tug, and allow tug to put extra coals on ship, insure the ship, and be responsible for all loss or damage, and that the Towboat Company would not assume any responsibility while on the trip. In another letter, of January 10th, the Towboat Company confirmed a long-distance telephone conversation, insisting that pilot charges out of New Orleans be paid by charterers, and stating: "We can arrange the necessary crew for your account for the San Pasqual," and "we will advise you conditions on which crew can be had, and will await your instructions. We think with the master, mate, first and second engineers, two firemen, two sailors, and a cook, making a total of nine, can be arranged. If you have an agency, or any other of your friends here that you would rather arrange the crew for you, it will be perfectly satisfactory to us." Further on, the letter repeats: "We also want it understood that you are to insure the ship, as we will not be responsible for any loss or damage while in tow of the tug, either at New Orleans, at sea, or going into Santiago. If the above is satisfactory, kindly acknowledge same."

On January 13th, the Tankers' Corpora-

tion telegraphed: "All our wires most explicitly stated you to furnish crew, and arrange their return. Regret misunderstanding but charterers holding us. This condition most embarrassing situation. Advise quickly how much additional necessary for you to take care this feature paying crew subsistence bringing back on your tug. We will have to pay this ourselves as can't now get from charterers. Please make very best basis you can answering straight message quickly." On the same day the Towboat Company telegraphed: "Your wire to-day. Your offer four thousand dollars accepted includes towing ship to Santiago. You furnish crew on ship and pay same including subsistence. We to return them on tug. Same agreement as towing Chillcott to Trinidad, except you pay pilot charges for tug and ship at New Orleans and Santiago. This is best proposition we can make as four thousand dollars offered is very low."

Next day again the Towboat Company, having received a telegram, "Your letter tenth (10th) not clear concerning crew our proposition being lump sum including your furnishing crew providing subsistence paying wages returning same your boat," etc., telegraphed them: "Your wire. At no time did we agree to furnish crew for ship. It is out of our line. We think five hundred dollars will pay for crew and subsistence only providing steering engine, anchor, winches and boilers are ready for steam and you arrange for fuel oil to make trip. It is better you have inspection made to ascertain what is necessary to make trip." And in a letter of January 15th, the Tankers' Corporation, for the owners, confirming a long-distance telephone conversation of that day, said: "San Pasqual: It is understood you will go ahead and get the men, keeping the expenses down to the lowest possible minimum, inasmuch as we have made the contract with the Old Time in Havana and given them the price, which included this expense, and whatever will be we will have to pay. Mr. Nenz of the Kentucky Distilleries is handling the vessel, getting her in shape and if you will get in touch with him, he will give you information as to when vessel will be ready. We understand that you informed him as to the necessity of providing oil to run the boiler and steering engine."

On February 2nd, the Towboat Company wrote a letter confirming a telegram concerning other towage and included reference to that of the San Pasqual: "We are ready to go with the San Pasqual but Mr. Nance advises us that the ship will not be ready until Friday, so we are giving you plenty of time so you can arrange when the ship arrives at Santiago to have the tug released at once. If we are delayed over five or six hours at Santiago we are going to insist in paying demurrage," etc.

The file of correspondence also includes a copy of a letter from the Tankers' Corporation to their principal, the Old Time Molasses Company, through their manager in New York, showing that on January 10th they had advised the principal, among other things, that the price was to be $4,600; that the Towboat Company was to furnish the crew, provide their subsistence, and return it to New Orleans at their own expense. Of course, this principal, and not the Towboat Company, is responsible for the errors and mistakes of its agent. Moreover, the Towboat Company is not bound by this letter of advice, to which it was not a party.

To my mind the correspondence establishes plainly enough that the Towboat Company obligated itself to do no more than furnish the tug and towing equipment, and accepted no responsibility for the ship, except, of course, such as might result from its own negligence.

The testimony of Mr. Addison Outwater, president of the Tankers' Corporation, was taken on behalf of the Old Time Molasses Company. It is of dubious value. It is most unconvincing in character. He seemed intent on considering the negotiations closed by telegrams of date prior to January 10th, and assumed to ignore the Towboat Company's letters, yet he finally admitted that he agreed, on behalf of the owners, to hire the crew of the San Pasqual and pay for it. And, more importantly, he admitted that he only told the Towboat Company that because of the misunderstanding about the crew his company would have to pay for it to keep the cost down; that, in fact, this was not true, because the manager of the Old Time Molasses Company had already agreed to reimburse the Tankers' Corporation for it.

I am convinced by all of the evidence that the Towboat Company assumed no responsibility quoad the ship. On the contrary, that company expressly stipulated that it assumed no responsibility for the ship; that by its contract it assumed to furnish the towboat, hawser, and towing equipment for the voyage, and nothing further. In so far as it assisted in procuring a crew for the vessel, it plainly assumed no responsibility. It was not interposed between the owner and the master and crew of the vessel any more

than was the Tankers' Corporation, who negotiated the contract. In the matter of arranging for the crew, the pilot, and the making of suggestions for preparation of the ship, the Towboat Company was plainly rendering friendly assistance outside of and beyond the contract for the accomodation and convenience of its correspondent.

I therefore conclude that the contract for towage confirms the view that the San Pasqual is responsible as principal, and that the Barranca was servant to the ship, since the master of the ship and its crew were the agents of the owner; that the pilot was the ship's pilot, and in control of its operation, together with its master, for account of the owner; that the tug Barranca was used for motive power only.

Accordingly, a decree may be entered in favor of libelant and against the steamship San Pasqual, holding the said vessel liable for all damage resulting from the collision, and dismissing the libel in favor of the steam tug Barranca. For the reasons hereinabove assigned, a decree may also be entered in the proceeding No. 17,974, dismissing the libel of the Old Time Molasses Company, and in favor of the tug Barranca and the New Orleans Coal & Bisso Towboat Company, with costs.