**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 24-2263**

─────────────

MELANIE HOOD-WILSON,

        Plaintiff – Appellant,

    v.

BOARD OF TRUSTEES OF THE COMMUNITY COLLEGE OF BALTIMORE
COUNTY,

        Defendant – Appellee.

─────────────

Appeal from the United States District Court for the District of Maryland, at Baltimore.
Lydia Kay Griggsby, District Judge.  (1:20-cv-00124-LKG)

─────────────

Argued:  October 21, 2025                    Decided:  December 12, 2025

─────────────

Before NIEMEYER, AGEE, and RICHARDSON, Circuit Judges.

─────────────

Affirmed by published opinion.  Judge Agee wrote the opinion in which Judge Niemeyer
and Judge Richardson joined.

─────────────

Yaida O. Ford, FORD LAW PROS P.C., Washington, D.C., for Appellant.  Vincent Patrick
Jackson, KOLLMAN & SAUCIER, P.A., Timonium, Maryland, for Appellee.

─────────────

AGEE, Circuit Judge:

Melanie Hood-Wilson appeals the district court's grant of summary judgment to her former employer, Community College of Baltimore ("CCB"), on her disparate treatment claims brought under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e. Hood-Wilson contends that the district court improperly found that she failed to establish a prima facie case of race and gender discrimination and, in the alternative, to show that CCB's justification for its failure to promote her was pretext.

Even assuming Hood-Wilson established a prima facie case, we cannot conclude that she has met her burden of proving that CCB's justification for its decision—that the applicant selected for the position, Matthew Bernardy, was more qualified than her—was pretext. Consequently, we affirm the district court's judgment.

I.

A.

In 2001, CCB hired Hood-Wilson, a Black woman, as an adjunct instructor and Coordinator of the Single Step program. That program focuses on workforce development for individuals with disabilities. Five years after her arrival, Hood-Wilson was promoted to Director of Special Populations. During her tenure in that position, she increased the program's enrollment and annual revenue.

2

While Hood-Wilson worked at CCB, Dean Louise Slezak, a White woman, directly supervised her. At some point, Slezak also supervised Bernardy, Steven Jurch, and Jay Bouis—all non-Black men.[1]

In 2018, CCB posted three job openings: Assistant Dean of Workforce Solutions, Assistant Dean of Health and Business, and Assistant Dean of Applied Technology and Logistics. In the job description for the Assistant Dean of Workforce Solutions position, CCB outlined the following minimum requirements:

> Master's degree with ten (10) years of experience developing and implementing continuing education and workforce development programs. Preferred experience working with disadvantaged and underserved populations and [Workforce Innovation and Opportunity Act ("WIOA")] knowledge. Of the ten years' experience[,] five must be in a managerial capacity. . . .

J.A. 650. The description also outlined the ideal applicant's skillset, which included knowledge of workforce development systems, a demonstrated ability to manage large groups of people, and prior success in securing grants.

To decide whom to hire for the assistant dean positions, CCB created a five-person search committee. Relevant here, that committee included Slezak and CCB Vice President of Enrollment and Outreach Initiatives Michael Netzer, and it developed fourteen interview questions, which were used to evaluate the candidates for all three positions. Netzer was also the final decision maker for the Associate Dean of Workforce Solutions position.

---

[1] It is undisputed that Bouis and Jurch are White men. The parties agree that Bernardy is Hispanic, but Hood-Wilson maintains that he is a "white Hispanic man." J.A. 331, 977.

3

Committee members scored applicants' responses on a five-point scale and discussed their scores at the end of each interview.

Among others, Hood-Wilson and Bernardy applied for the Assistant Dean of Workforce Solutions position, Jurch applied for the Assistant Dean of Health and Business position, and Bouis applied for the Assistant Dean of Applied Technology and Logistics position. Following interviews with the applicants, the hiring committee gave Bernardy the highest score (285 points) and Hood-Wilson the lowest score (181 points) for the Workforce Solutions position. Based on the applicants' scores and qualifications, CCB's hiring committee recommended Bernardy to Netzer for the Assistant Dean of Workforce Solutions position, who then hired him.[2] Likewise, Netzer hired Jurch and Bouis for the other two assistant dean positions.

In an affidavit, Netzer explained his decision to hire Bernardy over Hood-Wilson for the position. Before his promotion to Assistant Dean of Workforce Solutions, Bernardy served as CCB's Director of Connections to Employment and the Interim Director of the Center for Adult and Family Literacy. Based on this experience and Bernardy's performance during the interviews, Netzer explained that Bernardy was the most qualified applicant. Netzer emphasized Bernardy's history of managing large organizations and

---

[2] The parties agree that Netzer was the final decision maker. Response Br. at 17–18; Oral Argument at 6:25–6:50, *Hood-Wilson v. Bd. of Trs. of Cmty. Coll. of Baltimore Cnty.*, No. 24-2264 (4th Cir. Oct. 21, 2025) (hereinafter "Oral Argument"). At oral argument, Hood-Wilson initially—and incorrectly—represented that Slezak, rather than Netzer, created the three assistant dean positions. Oral Argument at 4:07–4:20, 4:30–5:36. However, as counsel subsequently acknowledged, *id.* at 32:35–34:01, 34:38–35:05, Netzer stated that he created the positions, and Slezak testified that she "honestly [did not] know" who created them, J.A. 931.

4

budgets, his experience with Workforce Solutions programming, his relationships with agencies involved in that programming, his experience with WIOA funding, and his grant-writing experience. With respect to Hood-Wilson, Netzer concluded that she was less qualified than Bernardy because the Single Step program was smaller and had a narrower focus than the programs led by Bernardy. He also noted that Hood-Wilson did not have a background in welfare-to-work and workforce development systems, familiarity with WIOA, or grant-writing experience.

In November 2018, Hood-Wilson resigned from CCB, effective as of February 1, 2019, because she believed that Slezak was building a record to support the termination of her employment.

A month later, Slezak issued a Corrective Action Letter to Hood-Wilson for approving timecards from two of her Black female subordinates—Jarina Lloyd and Rakeah Glass—with overlapping hours, i.e., "double-dipping." In the letter, Slezak explained that Hood-Wilson "improperly and negligently mismanaged [her] fiscal responsibilities," resulting in approximately $5,000 in overpayments. J.A. 673. In her defense, Hood-Wilson maintains that White male employees, including Jurch, committed the same infraction, but that CCB did not punish them. Hood-Wilson, Lloyd, and Karen Paris (a former CCB payroll administrator) also averred that the double-dipping incident stemmed from adjustments to a new payment software, and thus Hood-Wilson's error was procedural, not fraudulent, in nature in their view.

Consistent with her earlier notice, Hood-Wilson left CCB on February 1, 2019.

5

B.

While still employed at CCB, Hood-Wilson filed a charge of discrimination with the Maryland Commission on Civil Rights, alleging race and gender discrimination under Title VII based on "harassment, discipline, denial of promotion[,] and constructive discharge." J.A. 689. The State's investigation ended when Hood-Wilson requested a right-to-sue letter from the EEOC, which she received on October 21, 2019.

Hood-Wilson commenced this action in January 2020, alleging disparate treatment claims based on race and gender, in violation of Title VII and the Maryland Fair Employment Practices Act.

CCB moved to dismiss Hood-Wilson's complaint for failure to state a claim, and the district court granted its motion. Hood-Wilson noted a limited appeal to this Court to challenge dismissal of her disparate treatment failure-to-promote claim under Title VII. *Hood-Wilson v. Cmty. Coll. of Baltimore Cnty.*, 850 F. App'x 844 (4th Cir. 2021) (per curiam). This Court reversed the district court's decision on that claim and remanded the case, directing Hood-Wilson to file an amended complaint consistent with its decision.[3] Hood-Wilson did so, bringing race- and gender-based Title VII disparate treatment claims limited to CCB's failure to promote her to the Assistant Dean of Workforce Solutions position and the decision to issue the Corrective Action Letter to her for timecard errors.

---

[3] Hood-Wilson did not appeal the dismissal of her state-law claims or her disparate discipline claim. Consequently, this Court affirmed their dismissal. *Hood-Wilson*, 850 F. App'x at 845. In her amended complaint, she did not bring any state-law claims or a disparate discipline claim. *See* J.A. 120–23.

6

The parties conducted discovery and, at its close, CCB moved for summary judgment. The district court granted that motion and, in so doing, reasoned that Hood-Wilson failed to provide direct or indirect evidence of intentional discrimination making it appropriate to proceed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996) (stating a disparate treatment failure-to-promote claim can proceed under any of these rubrics). The district court concluded that Hood-Wilson failed to show a prima facie case of discrimination and, even if she did so, failed to show that CCB's justification—that Bernardy was more qualified for the Assistant Dean of Workforce Solutions position—was pretext. Because Hood-Wilson's evidence was not sufficient to create a triable issue on her claim, the court entered judgment for CCB.

Hood-Wilson noted a timely appeal, and this Court has jurisdiction under 28 U.S.C. § 1291.

## II.

We review the district court's grant of summary judgment de novo. *Belmora LLC v. Bayer Consumer Care AG*, 987 F.3d 284, 291 (4th Cir. 2021). Under the familiar Rule 56 standard, summary judgment is only proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Further, we must "view the facts and all justifiable inferences arising therefrom in the light most favorable to . . . the nonmoving party." *Jacobs v. N.C. Admin. Off. of the Cts.*, at 565 n.1 (quotation marks omitted).

7

III.

Under the *McDonnell Douglas* burden-shifting framework, a plaintiff must first establish a prima facie case of discrimination. *Lettieri v. Equant Inc.*, 478 F.3d 640, 646 (4th Cir. 2007). "To do so, a plaintiff must show that (1) she is a member of a protected class; (2) her employer took an adverse action against her; (3) she had been fulfilling her employer's legitimate expectations at the time of the adverse action; and (4) the adverse action occurred under circumstances that raise a reasonable inference of unlawful discrimination[.]" *Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 649–50 (4th Cir. 2021). "Once a plaintiff makes out a prima facie case, the burden shifts to the employer to put forth a nondiscriminatory explanation for its actions." *Id.* at 650. "If the employer does so, the burden then shifts back to the plaintiff to show that the employer's explanation was actually a pretext for discrimination." *Id.* (cleaned up). In the failure-to-promote context, there are two avenues for a plaintiff to establish pretext: she can (1) "show[] that [s]he was better qualified, or" (2) "amass[] circumstantial evidence that otherwise undermines the credibility of the employer's stated reasons." *Adams v. Trs. of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 559 (4th Cir. 2011) (citation omitted).

We assume, without deciding, that Hood-Wilson has met her burden of showing a prima facie case of discrimination, and decide this case at the last stage of the *McDonnell Douglas* framework. We do so recognizing that the prima facie case is a "relatively easy test" to surpass, and that it is frequently in carrying her *ultimate* burden of showing failure-to-promote based on discrimination that a plaintiff's claim fails. *Young v. Lehman*, 748

8

F.2d 194, 197 (4th Cir. 1984). *Compare id.* (explaining that determining whether a plaintiff "was rejected under circumstances which give rise to an inference of unlawful discrimination" is "not a heavy burden"), *with Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 256 (1981) (explaining that the plaintiff's "burden of persuasion" after an employer offers a non-discriminatory justification for its decision "merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination"), *and Evans*, 80 F.3d at 960 ("[W]e must remember that 'the burden of establishing a *prima facie* case of disparate treatment is not onerous.'" (quoting *Burdine*, 450 U.S. at 253).

For its part, CCB offered the following non-discriminatory justification for hiring Bernardy: he was more qualified for the position. *Evans*, 80 F.3d at 960 ("[R]elative employee qualifications are widely recognized as valid, non-discriminatory bases for any adverse employment decision."). So the question is whether Hood-Wilson proffered circumstantial evidence sufficiently probative of discrimination, such as "[p]roof that [CCB's] explanation is unworthy of credence," to suggest that CCB's non-discriminatory justification for its action was pretext. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000). In undertaking that analysis, we may "compar[e] the plaintiff's qualifications with those of the person who received the promotion" and "consider the veracity of the reasons, annunciated by the employer, why the plaintiff did not receive the promotion." *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 269 (4th Cir. 2005).

9

Hood-Wilson argues that the district court erred in concluding that she failed to establish CCB's justification was pretext. In so doing, she contends that there is sufficient evidence in the record to create a genuine dispute over the following issues: (1) whether Bernardy is better qualified than her for the Assistant Dean of Workforce Solutions position; (2) whether Bernardy being pre-selected for the Assistant Dean of Workforce Solutions position over Hood-Wilson, or Jurch's and Bouis' alleged preselection for positions to which Hood-Wilson did not apply, somehow evinces discriminatory animus against her; and (3) whether certain circumstantial evidence is sufficiently probative of discrimination as to CCB's decision to hire Bernardy over Hood-Wilson. We conclude that no reasonable factfinder could find for Hood-Wilson on these points and therefore affirm the district court.

A.

First, we address Hood-Wilson's reliance on the candidates' relative qualifications. Where, as here, an employer relies on employee qualifications to justify an employment decision, "we [must remain] mindful that we assess relative job qualifications based on the criteria that the employer has established as relevant to the position in question." *Heiko v. Colombo Sav. Bank, F.S.B.*, 434 F.3d 249, 259 (4th Cir. 2006). Here, CCB's job description for the Assistant Dean of Workforce Solutions sought an applicant with, *inter alia*, "[k]nowledge of Federal, State and County welfare to work and workforce development systems," "[e]xcellent leadership/supervisory skills, including conflict resolution, and ability to manage large staff of 25+ individuals," an "[a]bility to establish, build and maintain complex inter-institutional relationships," an "[a]bility to develop financial plans

10

and manage large operating and grant budgets and expenditures," an ability to "[u]nderstand Performance Based funding," and a "[t]rack record of effective grant writing." J.A. 650. It also conveyed that CCB preferred applicants with "WIOA knowledge." *Id.*

With these requirements in mind, Netzer explained that Bernardy "was the best candidate for the position, hands down, because of his relevant experience, knowledge, and skill set." J.A. 662. He pointed to Bernardy's experience "with [WIOA] funding," "managing large organizations and budgets," "writing and managing grants," and "understanding all facets of Workforce Solution programming," including the "federal, state, and county programs designed to help disadvantaged and underserved populations become employed," as well as his "existing relationships with the agencies involved in Workforce Solutions programming." *Id.* In other words, Bernardy was chosen because he was a strong applicant for the position based on CCB's listed job requirements.

Hood-Wilson unsuccessfully attempts to create a genuine dispute as to whether Bernardy's qualifications were superior to hers by offering subjective evidence that Bernardy was less qualified and that she was more qualified than CCB claimed. For example, to rebut Bernardy's qualifications, Hood-Wilson relies on a sworn declaration from Tenesha Riden, her former coworker, wherein Riden explained that, in her opinion, Bernardy exhibited subpar leadership skills and poorly managed a grant-funded program. To highlight her own qualifications, Hood-Wilson cites Riden's testimony that Hood-Wilson had grant-writing experiences, as well as her own testimony that she had WIOA

11

and grant-writing experience and that she grew the Single Step program's revenue.[4] But "it is the perception of the decision maker which is relevant." *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (cleaned up). That some of Hood-Wilson's "coworkers may have thought that she did a good job, or that she did not deserve [to be denied the promotion], is close to irrelevant." *Id.* (cleaned up).

Looking to the final decision maker's perception leads firmly to the conclusion that he deemed Bernardy's qualifications to be more closely aligned with what was needed in this position than Hood-Wilson's. For instance, Netzer noted that the selection process was "not based on [] current job performance," but rather "based on how we thought they would perform as Assistant Dean." J.A. 663. This makes sense—current job "performance evaluation and the interview selection stage, which involves an analysis of how the applicant meets the core and functional competencies of the position that is open, are not interchangeable." *Anderson*, 406 F.3d at 272. Netzer explained that Hood-Wilson's "Single Step program is relatively small in terms of budget and personnel, and has a narrow focus," which "starkly contrasts [with] Bernardy's years of experience managing large organizations and large budgets and programs." J.A. 663. In addition, he stated that Hood-

---

[4] CCB argues that Hood-Wilson's "self-serving affidavit" is insufficient to overcome summary judgment. Response Br. 19. To the extent Hood-Wilson relies on her affidavit, standing alone, to defeat summary judgment, CCB has a point—this Court has cast doubt on the value of beliefs or opinions expressed in a self-serving affidavit in the absence of supporting evidence in the Title VII context. *See Cosby v. S.C. Prob., Parole & Pardon Servs.*, 93 F.4th 707, 717–18 (4th Cir. 2024); *Mackey v. Shalala*, 360 F.3d 463, 469–70 (4th Cir. 2004). Still, setting aside our qualms with the supporting evidence offered by Hood-Wilson, she has produced more than just her affidavit, so we decline to discredit her arguments on that basis.

Wilson "did not demonstrate [] a broad background in welfare-to-work and workforce development systems," and her "interview responses demonstrated she had little or no familiarity with WIOA, knowledge of which was a preferred qualification for the position." *Id.* Further, he noted that her "interview answers demonstrated that she had little or no experience writing or managing grants or performance-based funding," whereas "Bernardy had experience with millions of dollars of such funding." *Id.*

Netzer capably explained his conclusion that Bernardy was better qualified than Hood-Wilson for the position, relying on the candidates' past experiences and performances during the hiring process. Absent the requisite evidence that Hood-Wilson's "qualifications are demonstrably superior" to Bernardy's, we are loath to interfere with CCB's hiring decision. *Heiko*, 434 F.3d at 261–62. Even with Hood-Wilson's subjective view of her past performance, the record provides no reason to believe Hood-Wilson was demonstrably more qualified than Bernardy. In such circumstances, "the promotion decision remains vested in the sound business judgment of the employer," *id.*, lest this Court "sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination," *DeJarnette*, 133 F.3d at 299 (citation omitted).

In short, the record demonstrates that, upon review of Hood-Wilson's evidence that CCB improperly hired Bernardy over her based on their qualifications, a reasonable factfinder could not conclude that Hood-Wilson's qualifications were "demonstrably superior." *Heiko*, 434 F.3d at 261–62. Therefore, we decline to disturb CCB's decision to hire Bernardy as Assistant Dean of Workforce Solutions on that basis.

B.

Second, Hood-Wilson contends that CCB engineered the hiring process to promote Bernardy, Bouis, and Jurch to the assistant dean positions. She argues that CCB's alleged focus on those three White men was discriminatory because CCB deprived her, a Black woman, of the opportunity for a promotion. Hood-Wilson points to deposition testimony from another applicant for the positions who was not selected, who explained that he thought the interview questions were created to highlight Bernardy's, Bouis', and Jurch's knowledge and experience. She also relies on Paris' testimony that, in an email to the President of CCB, Netzer stated that the assistant dean positions were created so that Jurch, Bouis, and Bernardy would not leave CCB.

Once again, however, Hood-Wilson's argument misses the mark. "The argument that a supervisor may have preselected an employee for a promotion 'is not sufficient evidence for jurors reasonably to conclude' that the defendants' explanation for hiring [an individual] was pre[]text." *Anderson*, 406 F.3d at 271 (citation omitted). That is because "[i]f one employee was unfairly preselected for the position, the preselection would work to the detriment of all applicants for the job, black and white alike." *Blue v. U.S. Dep't of the Army*, 914 F.2d 525, 541 (4th Cir. 1990). Beyond CCB's alleged preselection of Bernardy, Bouis, and Jurch, Hood-Wilson fails to identify any aspect of the hiring process that permits a reasonable inference of discriminatory animus.[5] Thus, we are not persuaded

---

[5] For instance, at oral argument, Hood-Wilson was unable to identify any interview questions that are discriminatory, rather than simply aimed at the alleged preselected individuals' knowledge and experience. Oral Argument at 37:28–37:47.

14

by Hood-Wilson's reliance on CCB's alleged preselection of Bernardy, Bouis, and Jurch for the assistant dean positions. At bottom, preselection is not indicative on its own of discrimination, so this argument has no traction under the circumstances presented.

C.

Finally, Hood-Wilson argues that there was sufficient circumstantial evidence in the record of CCB's discriminatory animus towards Black women in general, and Hood-Wilson specifically. On this front, she relies on various allegedly discriminatory comments by Slezak and Hood-Wilson's receipt of the Corrective Action Letter.

Hood-Wilson's reliance on Slezak's purported comments is unavailing. She points to three alleged statements as evincing discriminatory animus: (1) in 2017, Slezak told Hood-Wilson that "she did not care for Martha's Vineyard" before adding that "[t]here are a lot of Black people there," J.A. 232; (2) Slezak complained in a meeting about "people in the city," i.e., Baltimore, "jumping rent," and then "turned to [Hood-Wilson] and said, "Melanie, I know you know all about that," J.A. 220; and (3) Slezak repeatedly impugned Hood-Wilson's competence, *see, e.g.*, J.A. 948 ("I told [Hood-Wilson] she's a good director from [a] 30,000-foot view, [but] that she doesn't know the ins and outs of everything[.]"); J.A. 960 ("I felt calling [Hood-Wilson] incompetent was much better than saying she did it on purpose and she should be fired for it[.]").

These statements suffer from a common fatal flaw: they are untethered to Netzer, the final decision maker as to whether to promote Bernardy over Hood-Wilson. Our caselaw makes clear that while "[i]t is regrettable that any distasteful comments will arise in the workplace, [] that cannot mean that the actual decision maker is impugned thereby."

15

*Wannamaker-Amos v. Purem Novi, Inc.*, 126 F.4th 244, 260 (4th Cir. 2025) (citation omitted). In considering failure-to-promote claims, "[i]t is the decision maker's intent that remains crucial, and in the absence of a clear nexus with the employment decision in question, the materiality of stray or isolated remarks is substantially reduced." *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 300 (4th Cir. 2010). "Relevant factors" that may create the requisite connection between discriminatory comments in the workplace and a challenged decision by the employer include "the identity of the speaker, the nature and substance of the comments, and the temporal proximity of the comments to the challenged decision." *Wannamaker-Amos*, 126 F.4th at 260 (citation omitted).

Hood-Wilson contends that such a nexus exists by virtue of Slezak's presence on the hiring committee. But the fact that Slezak was on the hiring committee, standing alone, does not render her stray and isolated remarks relevant. Although she had a limited role in the hiring process, four other individuals were also on the committee, including Netzer, the final decision maker. Hood-Wilson does not ascribe discriminatory intent to any other member of the committee, nor does she allege that Slezak took any actions during the hiring process itself that were detrimental to her candidacy.[6] Further, Hood-Wilson failed to proffer any evidence that any action of the committee had any discriminatory intent.

As a member of the hiring committee, Netzer participated in and scored each candidate's interview, and the record reflects that he and Slezak actually gave Hood-Wilson her highest scores. Further, Slezak's general comments about Hood-Wilson's

---

[6] In fact, Hood-Wilson failed to depose the other members of the hiring committee or introduce any evidence related to their roles or involvement in the hiring process.

16

competence do little to advance Hood-Wilson's theory of race- and gender-based discrimination. At most, they reflect that Slezak simply did not think Hood-Wilson was performing well, which does not suggest that her view was influenced by Hood-Wilson's race or gender. *See Laing v. Fed. Exp. Corp.*, 703 F.3d 713, 718 (4th Cir. 2013) (concluding that a "comment did not reflect a discriminatory attitude" when the speaker "never suggested that Laing's route might be changed [for an impermissible reason], rather than for some other, lawful reason"). And Slezak's remaining statements are "generalized comments about [Hood-Wilson's] protected class," i.e., Black women, which are less indicative of discriminatory animus than "discriminatory comments [that] relate to the employee's qualifications, performance, or character." *Wannamaker-Amos*, 126 F.4th at 259–60. We are also mindful that none of the alleged remarks occurred around the time of the hiring process that forms the basis of Hood-Wilson's claim. Indeed, the Martha's Vineyard comment occurred nearly a year before Hood-Wilson applied for the assistant dean position. *Cf. id.* at 260 (recognizing that "temporal proximity" of discriminatory comments to the adverse action is not required, but it is a "factor[] to be considered"). Against this backdrop, Hood-Wilson's reliance on Slezak's alleged comments to demonstrate discriminatory animus is misplaced.

Nor are we convinced that Hood-Wilson's receipt of a Corrective Action Letter, signed by Slezak, was so inconsistent with CCB's policy that it evinces discriminatory animus. In that letter, Slezak explained that Hood-Wilson "improperly and negligently mismanaged [her] fiscal responsibilities" by approving inaccurate timecards. J.A. 673. Setting aside that, once again, this evidence is divorced from the hiring process generally

17

and Netzer specifically, it is true that this Court has recognized that "deviations" from a company's internal policies "are [] circumstantial evidence from which pretext and discriminatory intent may be inferred." *Hollis v. Morgan State Univ.*, 153 F.4th 369, 383 (4th Cir. 2025). But the record indicates that Slezak *followed* CCB's policy in disciplining Hood-Wilson. According to the letter, CCB prohibits the falsification of college documents and Hood-Wilson was "verbally warned and counseled about [her] inattention to fiscal matters in the past." J.A. 674.

Based on these infractions, Slezak followed a Human Resources representative's recommendation that Hood-Wilson receive a written warning, despite Slezak's inclination to impose a more severe punishment. That is to say, Hood-Wilson violated CCB policy and, in line with Human Resources' guidance, Slezak issued a written warning related to that violation. These facts are a far cry from the kind of deviations this Court has found to be evidence of discrimination. *See, e.g.*, *Wannamaker-Amos*, 126 F.4th at 260–61 (finding that the decision to fire Wannamaker-Amos for a minor infraction, without taking any of the "progressive responses to work-related issues" laid out in the company's policy such as "verbal coaching[] [and] written warnings," could lead a jury to conclude that termination of employment was a deviation from policy indicative of discriminatory animus).

Finally, Hood-Wilson argues that the disparate treatment of employees who signed off on fraudulent timecards demonstrates discriminatory animus. She claims that other White male employees, such as Jurch, committed the same infraction that led to her Corrective Action Letter, but received no discipline. This argument misunderstands the

18

letter, which details Hood-Wilson's history of "inattention to fiscal matters." J.A. 674; *see* J.A. 673 ("Over the past several evaluations and throughout the year, I have met several times with you to discuss the importance of accuracy, oversight and fiscal management."). Hood-Wilson fails to suggest that any of the other White male employees who allegedly engaged in this misconduct carried the same type of history. Given this distinction, we cannot conclude that this incident reflects discriminatory animus. Consequently, we find that no reasonable factfinder could conclude that Slezak's disciplinary action evidences discriminatory animus.[7]

In sum, Hood-Wilson makes a mountain out of a molehill when it comes to her circumstantial evidence of discriminatory animus. That is clearly insufficient.

\* \* \* \*

As explained above, on this record, we are not persuaded that Hood-Wilson has adduced sufficient evidence of pretext to create a genuine dispute of material fact as to

---

[7] The district court construed Hood-Wilson's complaint as raising disparate claims based on (1) CCB's failure to promote her and (2) its decision to take disciplinary action against her for submitting inaccurate timecards but to promote a White employee who allegedly committed the same infraction. *Hood-Wilson v. Bd. of Trs. of Cmty. Coll. of Baltimore Cnty.*, No. 20-cv-00124-LKG, 2024 WL 4893641, at \*4 (D. Md. Nov. 26, 2024). On appeal, Hood-Wilson bases her disparate treatment claim only on CCB's failure to promote her. *See generally* Opening Br. Regardless, to the extent she maintains that the claimed disparate treatment related to the timecards support her Title VII claims, that argument is meritless. As noted above, Hood-Wilson fails to adduce evidence that the White employees who allegedly committed timecard infractions were similarly situated to Hood-Wilson, i.e., that they had the same history of inattention to fiscal matters that prompted CCB's disciplinary action against her. That failure is fatal to a disparate treatment claim. *See Cosby*, 93 F.4th at 714–15 ("Absent evidence that [allegedly similarly-situated individuals] engaged in the same conduct as [the plaintiff], they cannot serve as valid comparators." (citation omitted)).

CCB's justification for hiring Bernardy. Hood-Wilson raises several arguments to support her claim: that she is more qualified than Bernardy, that CCB preselected a White male over her, and that circumstantial evidence in the record evinces a discriminatory climate at CCB towards Hood-Wilson. Even construing all facts and inferences in her favor, however, Hood-Wilson's alleged evidence of discrimination simply would not permit a reasonable factfinder to conclude that CCB's justification for hiring Bernardy was pretext.

IV.

For the reasons set forth above, the district court's decision granting CCB's motion for summary judgment is

*AFFIRMED*.